**McEVOY TRAVEL BUREAU, INC.,**
**Plaintiff, Appellant,**

v.

**HERITAGE TRAVEL, INC., et al.,**
**Defendants, Appellees.**

No. 89–1999.

United States Court of Appeals,
First Circuit.

Heard March 5, 1990.

Decided June 1, 1990.

Daniel F. Featherston, Jr., with whom Christopher L. Maclachlan, Boston, Mass., was on brief, for plaintiff, appellant.

Louis M. Ciavarra with whom Michael P. Angelini, Vincent F. O'Rourke, Jr., and Bowditch & Dewey, Worcester, Mass., were on brief, for defendant, appellee Norton Company.

Marcus E. Cohn, P.C., with whom J. William Codinha, P.C., Fred A. Kelly, Jr., and Peabody & Brown, Boston, Mass., were on brief, for defendants, appellees Heritage Travel, Inc. and Donald R. Sohn.

Before CAMPBELL, Chief Judge, BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

LEVIN H. CAMPBELL, Chief Judge.

McEvoy Travel Bureau, Inc. brought a four count complaint under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968, against Heritage Travel, Inc., the President of Heritage, and Norton Company. The district court, 721 F.Supp. 15, granted the defendants' motions to dismiss for failure to state a claim. McEvoy appeals. We conclude that McEvoy's complaint fails to allege any predicate acts of racketeering activity. We, therefore, affirm.

## I.

Since this appeal is from a dismissal for failure to state a claim, we narrate the facts of the complaint in a light most favorable to the plaintiff-appellant, McEvoy Travel Bureau, Inc. ("McEvoy"). *See, e.g., Chongris v. Andover Board of Appeals,* 811 F.2d 36, 37 (1st Cir.), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987). In 1980, McEvoy and defendant-appellee, Norton Company ("Norton") entered into a long-term oral contract under which McEvoy was to be the exclusive agent for all of Norton's travel business in the Worcester, Massachusetts, area. McEvoy was a small travel agency operating in Worcester. Norton is a large corporation headquartered in Worcester. Under the Norton–McEvoy contract, Norton was entitled to rebates representing a share in McEvoy's commissions generated by car rentals, hotel reservations and convention business. At the time the contract was entered into, according to the complaint, travel agencies such as McEvoy were prohibited by federal regulations from giving rebates from air fare commissions to their corporate customers. However, beginning in 1983, regulations were modified to permit air fare commission rebates on domestic air travel, but not on international travel. At this time, McEvoy began permitting Norton to share in domestic air fare commissions. By 1983, the Norton account represented about two thirds of McEvoy's total commission income.

In March 1983, Norton made requests to several travel agencies, including McEvoy, to submit bids to serve as Norton's exclusive agent. McEvoy viewed this as a breach of its contract to serve as Norton's exclusive agent. McEvoy, therefore, refused to take part in the bidding and informed Norton of the reasons for its refusal. On May 5, 1983, the exclusive contract was awarded to defendant-appellee, Heritage Travel, Inc. ("Heritage"). Shortly thereafter, on May 16, 1983, Norton terminated McEvoy's services, effective July 31, 1983. After the loss of the Norton account, McEvoy's profits rapidly decreased until October 1985, when all McEvoy's assets were sold for $140,000.

In October 1983, McEvoy brought suit against Norton in the Massachusetts Superior Court, alleging breach of contract, deceit, and unfair or deceptive acts or practices under Massachusetts G.L. ch. 93A. The jury found for McEvoy on both the deceit and contract counts and awarded damages of $465,000. The Superior Court ruled, however, that McEvoy's arrangement with Norton in 1980 was not an enforceable contract because of the statute of frauds. The court accordingly entered judgment notwithstanding the verdict for Norton on the contract count. On the deceit count, the court denied Norton's motion for judgment notwithstanding the verdict, but ordered a new trial on that count unless McEvoy would accept a remittitur of $165,-000. McEvoy accepted the remittitur, reducing its damages to $300,000. The court then ruled that Norton was liable for a knowing or wilful deceptive practice under Mass.G.L. ch. 93A and, therefore, doubled the damage award to $600,000 and entered judgment for McEvoy on the deceit and the deceptive practices claims. Appeals by both Norton and McEvoy are now pending in the state court.

## II.

On December 2, 1988, McEvoy brought this action in the United States District Court for the District of Massachusetts against Norton, Heritage, and the President of Heritage, Donald Sohn (collectively referred to as "appellees"). The complaint alleges four counts under the Racketeer Influenced and Corrupt Organizations Act ("RICO")—two against Norton under 18 U.S.C. § 1962(a) and (c); one against Heri-

tage under 18 U.S.C. § 1962(a), and one against Sohn under 18 U.S.C. § 1962(c). Alleging that it was injured, "by reason of" the alleged RICO violations, McEvoy seeks treble damages and attorney's fees pursuant to 18 U.S.C. § 1964(c).[1]

■ Establishing a RICO violation under either section 1962(a) or section 1962(c), requires proof of a "pattern of racketeering activity" or of "collection of unlawful debt." *See* 18 U.S.C. § 1962; *H.J. Inc. v. Northwestern Bell Telephone Co.,* —— U.S. ——, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989).[2] McEvoy's claims rely only on the contention that the appellees engaged in a pattern of racketeering activity; there are no allegations of the collection of an unlawful debt. To establish a pattern of racketeering, a plaintiff must show at least two predicate acts of "racketeering activity", as the statute defines such activity, and must establish that the "predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* 109 S.Ct. at 2900. Racketeering activity is defined in 18 U.S.C. § 1961(1) as constituting certain specified state or federal crimes. These include mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343. *See* 18 U.S.C. § 1961(1).

The basis of McEvoy's RICO claims is McEvoy's contention that the appellees fraudulently ousted McEvoy as Norton's exclusive agent by means of a pattern of racketeering activity consisting of numerous acts of mail and wire fraud. According to the complaint, the fraudulent scheme consisted of three elements.

1. Section 1964(c) provides:
   Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

2. Section 1962(a) provides, in part:
   It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal ..., to use or invest, directly or indirect-

   ly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate commerce....
   Section 1962(c) provides:
   It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The first element involved the execution and performance of an allegedly illegal contract between Norton and Heritage that took effect in September 1983. McEvoy alleges that the only reason Norton terminated its exclusive contract was that Heritage was able to provide services at a lower cost. The complaint further alleges that Heritage was able to provide Norton with services at a lower cost solely because of an illegal contract under which Heritage rebated to Norton commissions from international travel air fares and made certain rent payments to Norton, both of which McEvoy contends violated Federal Aviation laws, 49 U.S.C.App. § 1373(b)(1) and 49 U.S.C.App. § 1472(d)(1) and (2), and corresponding federal regulations promulgated by the Civil Aeronautics Board.[3]

As the second element of the alleged scheme, McEvoy alleges that to commence business under the illegal contract, Norton and Heritage were required to obtain approval from the air industry's two self-regulatory associations, the Air Traffic Conference ("ATC") and the International Air Transport Association ("IATA"). *See Costantini v. Trans World Airlines,* 681 F.2d 1199, 1200 (9th Cir.) (approvals from ATC and IATA "are a prerequisite for a branch office to issue interstate and international airline tickets"), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 570, 74 L.Ed.2d 932 (1982). In order to secure this necessary approval, on June 16, 1983, the appellees allegedly submitted a fraudulent contract to the two regulatory associations. The submitted contract did not reveal the illegal rent payments and rebates on international air commissions, and specifically stated that Heritage would not in any way grant rebates to Norton. The actual Norton–Heritage contract, however, allegedly provided that Heritage would make the illegal rebates and rent payments. Although the actual contract was dated October 1983, by its terms, it was to take effect on September 1, 1983.

As the third element of the alleged fraudulent scheme, McEvoy alleges that Sohn and Heritage engaged in a "kickback" scheme with American Airlines, under which Sohn and Heritage allegedly received payments from American Airlines in violation of 49 U.S.C.App. §§ 1373 and 1472.[4] These payments are alleged to be part of the appellees' scheme to defraud McEvoy, because they were necessary to make the Norton–Heritage arrangement "financially viable for Heritage."

McEvoy alleges that in the course of securing ATC–IATA approval of the Norton–Heritage contract and carrying out the various alleged illegal payments, the appellees committed numerous acts of racketeering activity. The pattern of racketeering activity allegedly consists of the numerous uses of the mails and interstate wires that were necessary to carry out the three-part fraudulent scheme, i.e., the usages of the mails and wires necessary to secure ATC–IATA approval of the Norton–Heritage

**3.** Section 1373(b)(1) provides, in part,

No air carrier or foreign air carrier or any ticket agent shall charge or demand or collect or receive a greater or less or different compensation for air transportation, or for any service in connection therewith, than the rates, fares, and charges specified in then currently effective tariffs of such air carrier or foreign air carrier; and no carrier or foreign air carrier or ticket agent shall, in any manner or by any device, directly or indirectly, or through any agent or broker, or otherwise, refund or remit any portion of the rates, fares, or charges so specified, or extend to any person any privileges or facilities, with respect to matters required by the [Civil Aeronautics] Board to be specified in such tariffs except those specified therein ...

49 U.S.C.App. § 1373(b)(1).

Section 1472(d)(1) makes it a misdemeanor for an agent to knowingly and willfully give "any rebate or other concession in violation of the provisions of this chapter." Section 1472(d)(2) subjects to fines any person who knowingly and willfully "receives a refund or remittance of any portion of the rates, fares, or charges lawfully in effect for the air transportation of property ..., with respect to matters required by the Board to be specified in currently effective tariffs applicable to the air transportation of property...."

In light of our holdings below, *see* part III, we express no view on whether any of the payments alleged here would violate these provisions.

**4.** *See* note 3, above.

contract;[5] the mail and wire usages necessary to perform the Norton–Heritage contract (including the "thousands" of mailings and telephone calls necessary to arrange Norton's international travel arrangements from which Norton received the illegal rebates); and the usages of the mails in connection with the alleged illegal "kickback" deal that Sohn made on behalf of Heritage with American Airlines.

All three defendants moved in the district court for dismissal on several grounds: failure to state a claim, statute of limitations, and res judicata. The district court granted the motions, ruling that the complaint failed to state a claim for which relief could be granted.

### III.

McEvoy argues that the district court erred in dismissing its RICO claims. The appellees respond by arguing that the district court's dismissal may be affirmed on any of several grounds. The parties have thus raised numerous issues, including whether the Norton–Heritage contract is illegal; whether appellees' alleged conduct constitutes mail and wire fraud violations; whether the alleged conduct amounts to a pattern of racketeering activity; whether McEvoy's injury was caused by the alleged RICO violations; whether McEvoy's claims are barred by res judicata; and whether

the claims are barred by the statute of limitations. For the reasons explained below, we conclude that as a matter of law the allegations fail to show that the appellees engaged in a scheme to defraud anyone of property or money within the meaning of the mail and wire fraud statutes. Consequently, McEvoy's mail and wire fraud allegations and the derivative RICO claims are without merit. We, therefore, affirm without reaching these other issues.

### A.  *The Mail and Wire Fraud Statutes*

To establish that the appellees violated the mail and/or wire fraud statutes, McEvoy must show that the appellees engaged in a scheme to defraud with the specific intent to defraud and that they used the United States mails and/or the interstate wires in furtherance of the scheme. *See, e.g., Schreiber Distributing v. Serv–Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986); *United States v. Brien,* 617 F.2d 299, 307 (1st Cir.), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980).[6] In *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court held that to come within the compass of the mail fraud statute, the scheme to defraud must be intended to deprive another of money or property. *See also Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 320, 98

---

**5.** McEvoy suggests in its appellate brief that in addition to the mailings involved in obtaining the initial ATC–IATA approval of the Norton–Heritage arrangement, subsequent uses of the mails may have been required to *maintain* ATC–IATA approval. McEvoy briefly made a similar argument in its supplemental memorandum of law filed in the district court. However, McEvoy's complaint contains no allegations indicating that supplemental filings with the ATC and IATA were made or even were required. We need not decide whether this deficiency in the complaint precludes consideration of any subsequent mailings to the ATC and IATA, because even assuming that there were such mailings, this would not affect our analysis below.

**6.** The mail fraud statute provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ..., for the purpose of executing

such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail ... any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both....

18 U.S.C. § 1341.

The wire fraud statute provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate commerce, any writing, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined....

18 U.S.C. § 1343.

L.Ed.2d 275 (1987) (applying *McNally* to the wire fraud statute). Although *McNally* has been overridden by the enactment of 18 U.S.C. § 1346, effective November 18, 1988, *McNally* is applicable here, because the alleged conduct all occurred prior to the enactment of section 1346.[7] *See United States v. Bush*, 888 F.2d 1145, 1145–46 (7th Cir.1989) ("The new § 1346 could not be applied retroactively, given the Ex Post Facto Clause of the Constitution."); *United States v. Stewart*, 872 F.2d 957, 960 n. 2 (10th Cir.1989) (section 1346 does not apply to conduct occurring prior to November 18, 1988); *United States v. Davis*, 873 F.2d 900, 902 (6th Cir.) (section 1346 has no retroactive application), *cert. denied,* —— U.S. ——, 110 S.Ct. 292, 107 L.Ed.2d 271 (1989); *Corcoran v. American Plan Corp.*, 886 F.2d 16, 19 n. 4 (2d Cir.1989) (section 1346 held inapplicable to a RICO action alleging mail fraud which occurred before the enactment of section 1346). *Contra United States v. Berg*, 710 F.Supp. 438 (E.D.N.Y.1989) (holding that section 1346 applies retroactively to conduct occurring prior to the date of the *McNally* decision).[8]

### B. *The Fraudulent Scheme*

McEvoy claims that the appellees engaged in a fraudulent scheme to defraud McEvoy of its interest in Norton's travel business and that all of the alleged illegal acts of the appellees that were necessary to enable Heritage to effectively take over as Norton's travel agent were part of this alleged scheme. As is elaborated above, McEvoy alleges that the scheme consisted of three elements: 1) carrying out the provisions of the actual Norton–Heritage contract, including making the allegedly illegal payments; 2) securing ATC–IATA approval of the Norton–Heritage contract by submitting a phoney contract; and 3) arranging and maintaining an allegedly illegal kickback scheme between Heritage and American Airlines in order to make the Norton–Heritage scheme financially viable for Heritage.

McEvoy's contention that all the elements of the Norton–Heritage arrangement, as well as the ancillary Heritage–American Airlines agreement, could be characterized as a scheme to defraud within the meaning of the mail and wire fraud statutes is unpersuasive. We recognize that the scope of fraud under these statutes is broader than common law fraud, and that no misrepresentation of fact is required in order to establish a scheme to defraud. *See Atlas Pile Driving Co. v. DiCon Financial Co.*, 886 F.2d 986, 991 (8th Cir.1989). However, not every use of the mails or wires in furtherance of an unlawful scheme to deprive another of property constitutes mail or wire fraud. *See, e.g., Fasulo v. United States*, 272 U.S. 620, 47 S.Ct. 200, 71 L.Ed. 443 (1926) (use of the mails for the purpose of obtaining money by means of threats of murder or bodily harm is not a scheme to defraud under the mail fraud statute). Nor does a breach of contract in itself constitute a scheme to defraud. *See, e.g., United States v. Kreimer*, 609 F.2d 126, 128 (5th Cir.1980) ("[T]he [mail fraud] statute does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business contract."). *Cf. United States v. Greenleaf*, 692 F.2d 182, 188 (1st Cir.1982) ("breach of a fiduciary duty, *standing alone*, does not constitute mail fraud") (emphasis added), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983). Rather, the scheme must be intended to *deceive* another, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct. *See, e.g., United States v. Brien*, 617 F.2d 299, 307 (1st Cir.1980) ("The essence of a scheme is a plan to deceive persons...."); *United States v. Bohonus*, 628 F.2d 1167, 1172 (9th Cir.) (fraudulent scheme must be a scheme "calculated to deceive persons of

---

7. Section 1346 provides, "For purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."

8. Because the relevant language of the mail and wire fraud statutes is the same, we apply the same analysis to the allegations under both statutes. *See Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 320 n. 6, 98 L.Ed.2d 275 (1987).

ordinary prudence"), *cert. denied,* 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980); *Kreimer,* 609 F.2d at 128 (" 'scheme or artifice to defraud' implicates only plans calculated to deceive"). *Cf. Carpenter v. United States,* 108 S.Ct. at 322 (employee's misappropriation of employer's confidential information was scheme to defraud where employee "continued in the employ of the Journal, appropriating its confidential business information for his own use, *all the while pretending to perform his duty of safeguarding it* ") (emphasis added). *See also* Websters Third International Dictionary (defraud means "to take or withhold from (one) some possession, right or interest *by calculated misstatement or perversion of truth, trickery, or other deception* ") (emphasis added).

We do not see how the alleged illegal kickbacks, rebates, and rent payments—elements one and three of the alleged scheme—could themselves be construed as a scheme to deceive McEvoy, or anyone else, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct. While for the present purposes we accept as true McEvoy's allegations that the appellees engaged in an illegal rebate and kickback scheme, this conduct did not amount to a scheme to defraud.[9] There are no allegations that the alleged illegal payments were somehow used to induce McEvoy to give up its position as Norton's exclusive agent. The alleged illegal payments all occurred *after* Norton had already terminated McEvoy's contract. And there are no allegations that the illegal payments themselves were intended to or had the effect of misleading or otherwise deceiving McEvoy or anyone else. We, therefore, conclude that the first and third elements were not schemes to defraud within the meaning of the mail and wire fraud statutes. McEvoy's mail and wire fraud allegations must succeed, if at all, on the basis of the second element of the alleged fraudulent scheme—the submission of the phoney contract to obtain approval from the ATC and IATA.[10]

### C. *Deprivation of A Property Interest*

Regarding the second element, appellees argue that McEvoy's mail and wire fraud allegations fail as a matter of law for lack of any victim who was defrauded of *property.* Appellees contend that the objects of the alleged fraud—the ATC and the IATA—were not deprived of any property interest, but at most were deprived of their intangible interest, as regulators, in being able to regulate the airline industry properly. *See Corcoran v. American Plan Corp.,* 886 F.2d 16, 20–21 (2d Cir.1989) ("mail fraud statute protects only the government's interest as a property-holder, excluding protection of a governmental entity in its capacity as regulator"); *McNally v. United States,* 483 U.S. 350, 356–59 & n. 8, 107 S.Ct. 2875, 2881 & n. 8, 97 L.Ed.2d

9. McEvoy's use of the term "kickbacks" might be read to suggest that the alleged payments from American Airlines to Heritage involved fraudulent activity independent of McEvoy's loss of the Norton business. McEvoy does allege that these payments were intended "to defraud" competing air carriers by "locking in Heritage's business." However, there are no allegations indicating that these payments involved *deceiving* anyone. Rather, McEvoy's theory is simply that the payments constitute a fraudulent scheme by Heritage because they violated 49 U.S.C.App. § 1373 and because they were necessary to make the Norton–Heritage arrangement "financially viable for Heritage."

10. Since we hold below that the scheme to fraudulently obtain ATC–IATA approval of the Norton–Heritage arrangement was not a scheme to defraud anyone of money or property, the mailings and wirings alleged in connection with the alleged illegal payments would not constitute mail and wire fraud under *McNally,* even if they could be construed as being in furtherance of that scheme. We note, moreover, that the mere fact that these mailings and wirings occurred as a result of the scheme to fraudulently obtain ATC–IATA approval does not mean they could be construed as being in furtherance of that scheme. *See, e.g., United States v. Maze,* 414 U.S. 395, 405, 94 S.Ct. 645, 651, 38 L.Ed.2d 603 (1973) ("Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of the fraudulent scheme. But it did not do this...") (footnote omitted); *United States v. Tackett,* 646 F.2d 1240, 1244 (8th Cir.1981) ("The statute does not reach all mailings resulting from a fraudulent scheme, but only those which are in furtherance of the scheme.").

292 (1987) (the mail fraud statute does not protect the "intangible right of the citizenry to good government"; "any benefit which the Government derives from the statute must be limited to the Government's interests as property holder.").

We agree that neither ATC nor the IATA were defrauded for purposes of the federal mail and wire fraud statutes as they were then in effect. McEvoy, indeed, does not argue to the contrary. Rather McEvoy would have us find the requisite property loss (from the mailing of the phoney contract to the two regulators) in McEvoy's loss of the Norton travel account. McEvoy contends that the mailings of the fraudulent contract "to and from Norton and Heritage and to the ATC and IATA were a necessary part of the overall scheme to capture [and deprive McEvoy of] the Norton travel business...."[11]

We do not believe, however, that the deceptive submission of the phoney contract to the two associations, so that Heritage would be allowed to serve as Norton's agent, was a scheme to defraud McEvoy within the meaning of the mail and wire fraud statutes. To be sure, the object of the submission may have been to "deceive the regulatory associations into approving" the Norton–Heritage contract. This may have been part of a general plan having as its object the transfer of Norton's business to Heritage, leaving McEvoy bereft of its major client. But securing the regulatory associations' approval by devious means (thus permitting Heritage to serve Norton) did not mislead, trick or deceive McEvoy so as to defraud it. What appellees did to McEvoy was not to deceive it but to break off what McEvoy claims was a binding contract. The lack of a direct relationship between the regulatory fraud and McEvoy's injury is underscored by the fact that McEvoy was notified on May 16, 1983 that its arrangement with Norton was to end, while the phoney contract was not submitted to the ATC and IATA until June 16, 1983, at the earliest. There was, therefore, no causal connection, in the ordinary sense, between the fraudulent submission to the ATC and the IATA and McEvoy's injury. The latter was caused by Norton's withholding of its business from McEvoy, not some trick or artifice.[12] The alleged submission of the fraudulent contract was not intended to bring about the termination of McEvoy's contract; rather, the submission was intended to persuade the ATC and IATA to approve the Norton–Heritage contract.

---

**11.** It has already been determined in McEvoy's prior state court action that any contractual right that McEvoy might have had to Norton's travel services was unenforceable under the statute of frauds. The issue of Norton's contractual liability was fully litigated in that action and the Massachusetts Superior Court's determination was essential to its judgment on the contract claim. Consequently, under the doctrine of collateral estoppel, the determination that McEvoy lacked an enforceable contract right to Norton's travel business is binding here. *See Fireside Motors v. Nissan Motor Corp.,* 479 N.E.2d 1386, 1390, 395 Mass. 366 (1985). Since McEvoy lacked an enforceable contractual right to Norton's travel business, it could be argued that it has not been deprived of a money or property interest within the meaning of *McNally.* Compare *Roitman v. New York City Transit Authority,* 704 F.Supp. 346, 348 (E.D.N.Y.1989) (inability to obtain employment was not a deprivation of a property interest for purposes of mail and wire fraud statutes) and *United States v. Slay,* 717 F.Supp. 689, 693 (E.D.Mo.1989) ("mere contemplation of an ongoing contractual relationship" does not rise to a property right protected by the mail and wire fraud statutes) with *Lombardo v. United States,* 865 F.2d 155, 159–160 (7th Cir.) (defendants' fraudulent manipulation of sale of pension fund property caused deprivation of property interest where fund was deprived of "highest price for the ... property"), *cert. denied,* —— U.S. ——, 109 S.Ct. 3186, 105 L.Ed.2d 695 (1989). However, in view of our holding, we do not reach this question.

**12.** McEvoy argues that its injury did not occur all at once when Norton terminated the contract on May 16, 1983, or even when the termination took effect on July 31, 1983. Rather, McEvoy argues, its loss of annual commission from Norton represents an "on-going injury [which] approximately coincided with the first two years" of the Norton–Heritage arrangement. However, whether the injury is characterized as on-going or as occurring all at once at the time Norton gave notice that it was terminating McEvoy's contract, Norton's termination notice was the necessary and sufficient cause of the injury. Events occurring subsequent to that termination could not be the but-for cause of the termination, and *a fortiori* could not be the but-for cause of the injury which resulted from the termination.

In asking that we regard the alleged scheme to fraudulently obtain ATC–IATA approval of the Norton–Heritage arrangement as a "but for" cause of McEvoy's injury, McEvoy argues, as its complaint also alleges, that Norton's reason for terminating McEvoy's services was that Heritage would be able to provide services at a lower net cost to Norton, and that Heritage would not have been able to do so without obtaining ATC–IATA approval of the contract.

But this puts the cart before the horse. We do not believe the deceptive scheme to obtain ATC–IATA approval can somehow be transformed into a scheme to deceive McEvoy where the effective reach of the deception stopped at the two regulatory associations. While deceiving them may have been part of a larger plan having an adverse impact upon McEvoy, this fact did not make McEvoy the object of an act of mail or wire fraud. And, as we have indicated, the only parties deceived—the ATC and IATA—were not deprived of money or property. Under these circumstances, the appellees' alleged deceptive conduct was not a "scheme to defraud" anyone of money or property. *See United States v. Evans*, 844 F.2d 36, 39 (2d Cir.1988) ("If a scheme to defraud must involve the deceptive obtaining of property, the conclusion seems logical that the deceived party must lose some money or property.").[13]

Since McEvoy's complaint does not sufficiently allege a scheme to defraud

anyone of money or property within the meaning of the mail and wire fraud statutes, the complaint fails to allege even a single predicate act of racketeering activity, and *a fortiori* fails to allege a pattern of racketeering activity as is required under RICO.[14]

The judgment of the district court is, therefore, AFFIRMED. Costs to appellees.

---

**13.** McEvoy cites no authority suggesting that *McNally* can be satisfied by establishing the existence of a scheme to deceive one party, thereby depriving another of property. McEvoy relies on *Schmuck v. United States*, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). However, *Schmuck* addressed only the question of the requisite relationship between the mailings and the fraudulent scheme; it did not address the issue here of what relationship the deceptive conduct must have to the property deprivation to satisfy the dictates of *McNally*. *See Corcoran v. American Plan Corp.*, 886 F.2d 16, 20 n. 5 (2d Cir.1989) ("The Court [in *Schmuck*] did not address the question of whether the same party must be both deceived and injured to state a violation of section 1341."). The other cases relied on by McEvoy do not address this issue and, for the most part, these cases predate *McNally*.

**14.** To be sure, McEvoy has alleged a pattern of *unlawful* activity, insofar as it has alleged that the appellees were engaged in a long-term contract involving illegal payments in violation of 49 U.S.C.App. §§ 1373(b) and 1472(d). However, violations of those statutory provisions are not predicate acts of racketeering activity. *See* 18 U.S.C. § 1961(1). The mere fact that the Norton–Heritage operation, which as is explained above does not constitute a scheme to defraud, is allegedly illegal does not render it a pattern of racketeering activity. *Cf. Fleet Credit Corp. v. Sion*, 893 F.2d 441, 445 (1st Cir.1990) ("[A]cts of common law fraud that do not implicate the mails (or the wires) do not constitute 'racketeering activity' under the definition found within the RICO statute.").