USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-1111

 UNITED STATES,

 Appellee,

 v.

CHARLES S. CHRISTOPHER, a/k/a CHRIS CHRISTOPHER,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF RHODE ISLAND

 [Hon. Francis J. Boyle, Senior U.S. District Judge]

 Before

 Selya, Circuit Judge, 
 
 Coffin and Campbell, Senior Circuit Judges.
 
 

 Terrance G. Reed with whom Christopher A. Hostage and Reed &
Hostage P.C. were on brief for appellant.
 Craig N. Moore, Assistant United States Attorney with whom
Seymour Posner, Acting United States Attorney, Charles A.
Tamuleviz, Assistant United States Attorney and Lisa Simotas,
Attorney, Department of Justice were on brief for appellee.

 
 
 CAMPBELL, Senior Circuit Judge. Defendant-appellant
Charles S. Christopher was convicted after a jury trial in the
district court on eleven counts of wire fraud, 18 U.S.C. 1343,
and ten counts of interstate transportation of stolen goods, 18
U.S.C. 2314. As vice president of Resolute Holding Company
("Resolute"), Christopher orchestrated Resolute's acquisition in
1988 of American Universal Insurance Holding Company ("American")
and Diamond Benefits Life Insurance Company ("Diamond"). In
acquiring these companies, Christopher used assets of the acquired
insurance companies to, among other things, pay part of the agreed
purchase price and to clear liens from property put up as
collateral in the transaction. In so doing, Christopher violated
promises to state insurance regulators that Resolute would not use
the acquired companies' assets to pay for their purchase and that
pre-existing liens on the collateral would be cleared by the
closing. Both companies subsequently went into receivership.
 The district court sentenced Christopher to 121 months'
imprisonment and ordered restitution of $26.7 million. This appeal
followed. Aside from a single error in the calculation of
Christopher's restitution, we affirm.
 I. Background
 Following the judgment of conviction, "we sketch the
facts in the light most favorable to the jury verdict, consistent
with record support." United States v. Pitrone, 115 F.3d 1, 3 (1st
Cir. 1997).
A. Resolute's Purchase of American and Diamond
 Pursuant to state laws designed to protect policy
holders, Resolute had to seek the approval of insurance regulators
in Arizona, California, and Rhode Island before acquiring American
and Diamond. (American was a Rhode Island corporation, and Diamond
was an Arizona corporation subject to jurisdiction of both Arizona
and California.) In each application, known as a "Form A,"
Resolute proposed to infuse the target companies with much-needed
capital. That capital was to come from business entities
controlled by George W. Reeder, Resolute's majority owner, in the
form of promissory notes. Three of the notes are relevant here. 
The first was payable to American for $50 million and was executed
by Hilltop Developers ("Hilltop"). Hilltop's sole shareholder was
Reeder. Two Hilltop properties known as "Heritage Ranch" and
"Indian Palms" served as collateral for this note. 
 Hilltop and Reeder executed a second note in the amount
of $12 million payable to Diamond. That note was secured by
"Indian Springs," another property also owned by Hilltop and
Reeder. 
 The third note, this one for $3 million, was also to be
given for the acquisition of Diamond. This money came from Mydar
Business Group, Inc. ("Mydar"). While all of Mydar's stock was
nominally held by Tom Christopher, the defendant Christopher's
brother, the defendant himself held a fifty percent "silent"
interest in Mydar. The Mydar note was secured by "Big Springs," a
property surrounding defendant Christopher's personal residence. 
 Diamond was to receive further capital from a cash-for-
annuities exchange with the Life Assurance Company of Pennsylvania
("LACOP"). Arranged by Christopher and Resolute, this transaction
gave Diamond $29.4 million ($18 million at closing) from LACOP in
return for Diamond's assumption of $31 million in LACOP's annuity
obligations. 
B. Regulatory Approval of the Acquisitions
 At the time of the applications, each of the four
properties securing the described promissory notes (Heritage Ranch,
Indian Palms, Indian Springs, and Big Springs) were encumbered by
prior liens. Because of these encumbrances and other concerns,
insurance regulators in each state were reluctant to approve the
purchase. 
 Faced with regulatory disapproval, Resolute and
Christopher provided a number of assurances to the regulators
causing them to acquiesce. Christopher and Resolute assured 
Arizona that all encumbrances on the collateral would be removed by
the time of the closing. Resolute's Arizona Form A represented
that "it is expected" that at the closing of the purchase of
Diamond the liens on the collateral "will be paid in full." 
 Similarly, Christopher assured Rhode Island insurance
regulators through Resolute's attorneys just ten days before the
American transaction closed that the collateral "will be free and
clear of all liens at the time the property is transferred to
[American]." Christopher's attorney testified that every document
representing that Resolute would pay off the liens before closing
was prepared with information Christopher provided. Rhode Island
issued a Conditional Order on May 27, 1988, approving Resolute's
purchase of American. That order provided that, although the
transaction closed that day, the change of ownership would not be
official until Resolute submitted final title insurance policies
for Heritage Ranch and Indian Palms "to be effective as of the
closing date which indicate[] . . . that all . . . mortgages, deeds
of trust, and the like have been paid in full and discharged." 
 On June 7, 1988, California approved the Diamond
acquisition subject to Resolute's written commitments that (1) "no
part of the purchase price for Diamond Benefits would be obtained
from its assets," (2) Resolute would raise Diamond's capital and
surplus to $3 million, and (3) for purposes of determining that
capital, the $12 million and $3 million notes would be given no
value. 
C. Christopher Clears the Collateral Properties' Pre-
 Existing Liens

 When the acquisition of American closed on May 27, 1988,
the pre-existing liens on the four collateral properties were still
outstanding. Likewise, when the Diamond acquisition closed on June
14, 1988, the liens on that collateral were still outstanding. So
much was undisputed at trial. 
 On July 25, 1988, well after both the Diamond and
American acquisitions closed, Christopher and Resolute attorney
Jarrell Ormand sent over $3.3 million "from," as Christopher
himself put it, "Resolute, [American], and/or Diamond" to First
American Title. As Resolute was a holding company with virtually
no cash, the bulk of the $3.3 million came from the acquired
insurance companies. Christopher's letter directed First American
Title to use the money first to satisfy the pre-existing liens and,
second, to issue title insurance policies to Diamond and American
pertaining to the collateral properties. 
 Christopher instructed First American Title
parenthetically that these policies were to be back-dated to the
closing date. Thus, in one instance, Christopher wrote the title
insurer that American was to "receive . . . a CTLA Mortgagee's
Title Insurance Policy (dated as of May 27, 1988) in connection
with [the collateral properties]." That letter contained no
explanation for the back-dating request.
 Four days later, Ormand, Resolute's attorney, also wrote
First American Title at Christopher's direction to request that the
policies be dated back to the date of closing. He stated simply
that for Indian Springs (collateral for Diamond), the "policy . . .
should be dated as of June 14, 1988," and that for Indian Palms
(collateral for Diamond and American), "[i]t should be dated as of
May 27, 1988." Christopher then sent Rhode Island regulators what
he described as "[o]riginal copies of title insurance policies
dated as of May 27, 1988." Ormand also testified that Christopher
told him that "we're going to take $18 million out of Diamond
Benefits and pay down the liens on [the collateral properties]." 
 First American Title forwarded Christopher title policies
dated, per his requests, to match the closing dates. First
American Title's chief title officer testified at trial that his
company back-dated the policies at "the request of the insured and
we were willing to be accommodating in this instance." He
testified he was unaware of Christopher's purpose in requesting the
earlier date. 
 First American Title's representative also testified that
in back-dating the policy, the company was not protecting American
and Diamond against any additional risk or providing them with any
additional assurances. He believed that First American Title
actually reduced its risk by dating the titles as of the closing
since the terms of the policy guaranteed the title only as of the
period beginning with the execution of the promissory notes and
ending with the date on the policies. In any case, while the
back-dating might suggest that the insurance companies had obtained
a first position on the collateral by the actual date of the
closing, that was not the case, as Christopher knew. 
D. Financing the Acquisitions: The Insurance Companies 
 "Loans" and the Purchase of Desert Aire

 Notwithstanding Christopher's representations to
regulators that the collateral liens would be paid off by time of
the closing, and that assets of the acquired the companies would 
not be used for the purchase, Christopher caused actions to be
taken that, the jury could find, violated both representations. 
After the closing, the insurance companies "loaned" cash to Hilltop
and Mydar, the owners of the collateral, which they used to remove
the liens on the collateral. Cash belonging to Diamond was also
used to pay Diamond's purchaser. Hilltop and Mydar noted on their
books the crediting of "intercorporate credits" in favor of Diamond
and American. In due course, both insurance companies went into
receivership and became unable, by themselves, to meet their
liabilities to policyholders. These transactions are described in
greater detail below. 
 1. The Hilltop/Windbrook Note
 At Christopher's direction, Diamond loaned $18 million to
Hilltop. The loan was secured by Windbrook Country Club, itself
then worth $5 million. Christopher arranged for Diamond to obtain
this cash by opening a bank account in its name and then having
LACOP transfer the purchase money for Diamond's newly acquired
annuity obligations into that account. That transfer formed the
basis for Count 1 of the indictment.
 Christopher directed the distribution of several million
dollars before regulators called a halt to the scheme. Two
transfers of about $1.9 million each went to pay off Diamond's
former owner in satisfaction of a large portion of the agreed
purchase price of Diamond (Counts 2, 3 (wire fraud), 12, and 13
(interstate transportation of stolen goods)). According to the
prosecution, this flagrantly violated California's prohibition
against using Diamond's own assets to pay the purchase price. The
next transfer (Counts 4 and 14) of about $440,000 paid off
Christopher's personal note on the Big Springs property. 
Christopher then wired $8.7 million (Counts 6 and 15) to clear the
liens on Heritage Ranch, the property securing the $50 million note
contributed to American. Three more wires sent $465,000 to Hilltop
(Counts 7 and 16), $825,000 to a trust account for Reeder himself
(Counts 8 and 17), and $459,000 to Hilltop and a Reeder account
(Counts 9 and 18). $5.9 million was used to pay off the liens on
Indian Palms, one of two properties securing the note for
American(Counts 10 and 19); this amount exhausted the LACOP funds,
so Christopher ordered the transfer of $3 million from American to
the new Diamond account.
 2. The Mydar Note
 At Christopher's direction, American loaned $5.4 million
to Mydar. Mydar's note was secured by Big Springs, a property
worth no more than $330,990. Since Big Springs was already
securing the $3 million promissory note from Mydar to Diamond,
Christopher simply canceled that note.
 Christopher then distributed the proceeds of the $5.4
million "loaned" by American to Mydar as follows: $3.1 million was
disbursed to Resolute, which immediately returned it to American. 
Similarly, $1.46 million was given to Resolute, which then gave it
right back to Diamond. Diamond received $440,000 directly,
replacing the money Christopher had used to pay off his mortgage. 
$138,000 (Counts 5 and 20) was used to clear additional liens on
Big Springs.
 3. Desert Aire
 Christopher arranged for American to pay $15.1 million
for Desert Aire, a property in California with an appraised value
of $7.5 million (and title insurance in that amount) and time share
notes worth $7.5 million, generating income monthly. However,
Christopher's attorney testified at trial that the actual purchase
price was initially only $11.75 million and that at Christopher's
direction he falsely inflated the purchase price in a letter
documenting the transaction. The remaining $3.3 million of the
proceeds generated by this falsification went to pay off the liens
for Heritage Ranch and Indian Springs (Counts 11 and 21).
 In the summer of 1988, just months after the Resolute
acquisitions, an audit of Diamond revealed the disbursement of the
LACOP funds. In September, 1988, Resolute terminated Christopher's
duties. Diamond went into receivership later in 1988. American
spent two weeks in receivership during the fall of 1988, and became
irretrievably insolvent by 1991. 
 II. Discussion
A. Sufficiency of the Evidence
 On appeal, Christopher contends that there was
insufficient evidence to convict him of wire fraud. He attacks
each of the three categories of the wire transfers: (1) those used
to pay off pre-existing liens on the collateral properties, (2)
those that paid for Diamond's purchase price, and (3) those that
relate to the wiring of cash to LACOP in exchange for the
assumption of LACOP's annuities. Essentially, Christopher argues
that his scheme did not violate any promises made to the
regulators. We disagree.
 1. Satisfaction of Pre-Existing Liens
 Christopher concedes that, with the exception of the wire
transfers for Diamond's purchase price (Counts 2, 3, 12, and 13),
the wire transfers paid off pre-existing liens that encumbered the
properties pledged as collateral. He disputes that any regulator
forbade the payments. He points to a change Rhode Island
regulators made from a draft of their conditional order: the
initial version required the liens to be cleared "at the time of
closing," while the conditional order that actually issued stated
that the liens were to be cleared "effective as of the closing
date." As for California and Arizona, he denies that any regulator
required the satisfaction of pre-existing liens.
 Respecting the Rhode Island conditional order, there was
ample evidence that Christopher, in the course of correspondence
and dealings with regulators, represented that he would see that
the liens were cleared before the closing. In light of this
evidence, the jury could have found that the conditional order
itself could not reasonably be understood to sanction continuance
of the liens for two months after the closing occurred. Hence the
 language requiring an indication that "as of the closing
 date . . . all mortgages, deeds of trust and the like have been
 paid in full and discharged" meant that the encumbrances would be
 discharged as of the closing date, not of some later date. The
 lead Rhode Island regulator testified to understanding that the
 "effective as of" closing language meant that the properties would
 in fact be lien-free on the date of the closing; the contested
 language simply allowed Resolute to close the transaction
 immediately and to send later its documentation that the insurance
 companies held a first security interest as of the closing. She
 testified that documentation "had to reflect the conditions as of
 the date of the closing." The "effective as of" language permitted
 only later documentation, not a later clearing of the liens. 
 Such an understanding would accord with the regulators'
 statutorily-mandated goal of ensuring that the insurance companies
 were adequately capitalized. See infra. All concerned knew that
 the targeted insurance companies were in need of immediate capital,
 and it was in this context that Christopher had promised that
 Resolute virtually a shell corporation would see that both
 companies' surpluses were increased. Without reliable collateral,
 the promissory notes could not be counted on for this purpose. To
 allow the liens to remain after closing would leave the companies'
 capital deficiency, at the very least, unresolved, and opened up
 the possibility which in fact occurred that the liens would be
 extinguished by use of the acquired companies' already depleted
 funds. Either option was plainly untenable in light of the
 regulators' concerns, of which Christopher was well aware. The
 jury could conclude that Christopher realized that his scheme
 exceeded the scope of Rhode Island's conditional order, and,
 indeed, was an obvious subterfuge designed to evade it. 
 As for California and Arizona, Resolute's attorneys,
 acting at Christopher's direction, promised that the collateral
 pledged to Diamond would be lien-free by closing. Christopher
 relies on the fact that the Arizona and California approval orders
 contained no express requirement that the liens be cleared prior to
 closing. The jury could conclude, however, from the communications
 between Christopher, his attorneys and the regulators that
 Christopher made representations to this effect which he realized
 were essential to securing their approvals.
 2. Wires Transmitted for the Purchase of Diamond 
 Christopher promised that Resolute would not use
 Diamond's assets to help pay its purchase price. He now argues
 that he did not use Diamond assets to purchase Diamond, but simply
 advanced Diamond's assets to Resolute in the form of "loans" 
 in exchange for offsetting credits and a note. Since the
 government adduced no evidence that Diamond did not in fact receive
 such a credit, he contends, the convictions based on that purchase
 must be vacated.
 Here, Christopher is simply splitting hairs. The funds
 that paid for the purchase of Diamond came out of Diamond's LACOP
 money and contradicted California's express order that no part of
 the purchase price for Diamond could come from Diamond's assets. 
 To call them "loans" makes no difference. The later "credits" did
 not legitimate the transaction, but, the jury reasonably could have
 found, were merely part of a shell game Christopher devised to hide
 the nature of the transfers. See United States v. Jimenez-Perez,
 869 F.2d 9, 10 (1st Cir. 1989) ("[The jury] could legitimately have
 presumed that the fabrication[s] w[ere] all the more proof of
 [defendant's] guilt."). 
 3. Wire Transfer of LACOP Proceeds to Diamond
 Count 1 of the indictment was based on Christopher's
 deposit in a special account, kept secret from Diamond's directors,
 of the cash Diamond received in exchange for assuming the LACOP
 annuities. Christopher argues that this transfer could not be
 fraudulent because LACOP and Diamond had entered into a contract to
 transfer the annuities for cash.
 The transfer and misuse of the LACOP money was an
 indispensable part of Christopher's fraudulent scheme. He could
 not have obtained that money without having made misrepresentations
 to state regulators that induced them to approve Resolute's
 acquisition of Diamond, including promises that none of Diamond's
 assets would be used to pay its purchase price and that the LACOP
 funds would be invested in government bonds and other liquid
 investments. The fraudulent nature of the transfer was highlighted
 by Christopher's opening of an account for Diamond in which he
 deposited the $18 million and which he kept secret from Diamond's
 officers, and from which he improperly distributed the funds. We
 find ample evidence of Christopher's fraudulent intent with respect
 to the funds transferred from LACOP.
 B. Deprivation of "Property"
 Christopher challenges the validity of his conviction in
 light of McNally v. United States, 483 U.S. 350 (1987). In
 McNally, the Supreme Court reversed a fraud conviction based on a
 deprivation of state citizens' right to honest government services
 and held that " 1341 [is] limited in scope to the protection of
 property rights." Id. at 360. 
 According to Christopher, his conviction exceeds the
 McNally limitation. First, he reasons that he did not deprive any
 state of "property," as the states' regulatory interest in his
 acquisitions amounted to nothing more than the public's right to
 honest government services precisely the result forbidden in
 McNally. Second, Christopher contends that the deception of the
 state insurance regulators, resulting in increased risk and actual
 losses of policyholders was at most a form of indirect
 victimization not prohibited by the wire fraud statute. 
 Christopher says the wire fraud statute requires "convergence" 
 that is, the scheme must deceive the same person whom it deprives
 of money of property. This is an issue that has generated a split
 of authority. Compare United States v. Blumeyer, 114 F.3d 758,
 767-68 (8th Cir.)(expressly rejecting convergence doctrine), cert.
 denied, 118 S. Ct. 350 (1997), with United States v. Lew, 875 F.2d
 219, 221-22 (9th Cir. 1989). We deal with these arguments in
 reverse order, turning first to "convergence" and then the question
 whether "property" is involved.
 1. Convergence
 We reject Christopher's argument that this court has
 already adopted the convergence theory. Christopher relies for
 this proposition on McEvoy Travel Bureau, Inc. v. Heritage Travel,
 Inc., 904 F.2d 786 (1st Cir. 1990), and United States v. Sawyer, 85
 F.3d 713 (1st Cir. 1996). Neither case mentions the term
 "convergence." 
 In McEvoy Travel, a travel agency brought a civil RICO
 action, see 18 U.S.C. 1964(c), against a competitor who had won
 an exclusive contract with a former client of the plaintiff. The
 complaint alleged predicate mail and wire fraud violations based on
 the competitor's fraudulent statements to industry regulatory
 agencies in order to cause them to approve the exclusive contract. 
 See McEvoy Travel, 904 F.2d at 788-89. The district court
 dismissed for failure to state a claim, and we affirmed. 
 Christopher points to our statement that "[w]hile deceiving [the
 regulators] may have been part of a larger plan having an adverse
 impact on [plaintiff] McEvoy, this fact did not make McEvoy the
 object of a mail or wire fraud." Id. at 794. 
 This statement in McEvoy Travel was directed not to the
 scheme-to-defraud element, but rather to the sufficiency of
 causation. See id. at 793 ("There was . . . no causal connection,
 in the ordinary sense, between the fraudulent submission to the
 [regulatory agencies] and McEvoy's injury. The latter was caused
 by [the client] Norton's withholding of its business from McEvoy,
 not some trick or artifice."). In the scheme urged by the McEvoy
 Travel plaintiff, the deception actually followed the loss. Seeid. When we reasoned that no mail or wire fraud had occurred
 because "the only parties deceived [the regulators] were not
 deprived of money or property," id., we were simply making the
 point that the deception must in fact cause the loss. 
 Christopher also seizes on a footnote from our opinion in
 United States v. Sawyer, 85 F.3d 713 (1st Cir. 1996), a prosecution
 for a scheme to deprive another of the right to honest government
 services under the revised 1346. Sawyer was a lobbyist who, in
 violation of a state statute, gave gifts to state legislators. 
 This court vacated Sawyer's mail fraud convictions based on
 defective jury instructions. We then rejected the prosecution's
 alternative theory that Sawyer's deception of his employer (he had
 hidden the gratuities) was a prohibited scheme to defraud. The
 footnote relied on by Christopher stated in relevant part:
 Sawyer's deceptive conduct toward [his
 employer], alone, cannot form the basis of
 this honest services fraud conviction. 
 Rather, the alleged victims of the mail fraud
 here, the state and the public must be the
 ones deceived. Thus in order for any
 deception of [the employer] to form a part of
 the scheme to deprive the Commonwealth and her
 citizens of legislators' honest services, some
 showing that such conduct was connected to the
 defrauding of alleged victims is required.
 
 Sawyer, 85 F.3d at 734 n.18 (citations omitted and emphasis added). 
 As in McEvoy Travel, the Sawyer panel simply rejected a fraud claim
 based on misrepresentations that did not cause relevant harm;
 neither decision required a convergence theory. We, therefore,
 reject Christopher's claim that this court has previously adopted
 the convergence view of the mail and wire fraud statutes.
 Turning to whether we should now adopt a convergence
 theory, we see little reason to do so. Nothing in the mail and
 wire fraud statutes requires that the party deprived of money or
 property be the same party who is actually deceived. The phrase
 "scheme or artifice . . . for obtaining money or property by means
 of false or fraudulent pretenses, representations, or promises," 18
 U.S.C. 1341, is broad enough to include a wide variety of
 deceptions intended to deprive another of money or property. 
 McNally itself says nothing about convergence. See United Statesv. Evans, 844 F.2d 36, 39 (2d Cir. 1988). We see no reason to read
 into the statutes an invariable requirement that the person
 deceived be the same person deprived of the money or property by
 the fraud. If, for example, the role of a government regulator is
 to protect the monetary interests of others, a scheme to mislead
 the regulator in order to get at the protected funds will affect
 "property rights" as required in McNally. 
 2. Protection of Property Rights
 The deception in the present case did not simply relate
 to depriving the citizens of California, Arizona and Rhode Island
 of the honest services of government officials in some abstract
 sense. The three states' insurance codes each provided that its
 regulators may disapprove an acquisition of an insurance company
 when "[t]he financial condition of an acquiring person is such as
 might jeopardize the financial stability or prejudice the interests
 of its policyholders." Cal. Ins. Code 1215.2(d)(3) (West 1998);
 see also Ariz. Rev. Stat. Ann. 20-481.07(A)(6) (West 1997)
 (same); R.I. Gen Laws 27-35-2(d)(1)(iii) (1997) (same). 
 Christopher was accused of intentionally subverting requirements
 imposed by state insurance regulators designed to protect the
 financial health of two insurance companies during their purchase
 by Resolute, Christopher and his associates. By his deceptive
 representations and by making a deliberate end run around those
 requirements, Christopher siphoned over $26 million from the
 coffers of the two companies, diverting to his own purposes funds
 the regulators sought to protect. Thereafter, both companies
 became insolvent, threatening or causing actual monetary loss to
 policyholders and to special funds established under state law to
 protect policyholders in the event of a company's insolvency. The
 purpose and result of the fraud plainly related to money. While
 the true victims were not merely the deceived regulators, the
 causal connection between the deception and the loss of property is
 obvious. See McEvoy Travel 904 F.2d at 793. 
 The prosecution's theory of the case was as just stated. 
 The indictment charged that false statements to the insurance
 regulators first enabled Christopher and his associates to arrange
 for the siphoning of Diamond's and American's assets, and that they
 then further concealed the wrongdoing. Both American and Diamond
 went into receivership. Given that Christopher arranged for each
 company to get far less than he promised from the acquisition, the
 jury could reasonably have concluded that the scheme was designed
 to deprive and did in fact deprive the insurance companies of
 property, placing the policyholders in ultimate jeopardy. In
 instructing the jury, the district court first reiterated the
 scheme as charged in the indictment, then explained that a "scheme
 or artifice to defraud is an intentional course of conduct which is
 done for the purpose of depriving a person or corporation of some
 possession, right, or interest by means of false or fraudulent
 pretenses, representations, promises, or other deceptive conduct." 
 Based on the indictment and instructions, the jury could not have
 convicted Christopher had it not found that his fraudulent
 representations were a means to take money from American and
 Diamond and to use those funds for improper purposes concealed from
 the regulators. Such a finding places Christopher's conduct well
 within the reach of 1341.
 C. Denial of Jury Instruction Regarding Advice of Counsel
 Christopher requested that the court instruct the jury
 that good-faith reliance on the advice of counsel is a defense to
 wire fraud. The district court denied this request on the ground
 that Christopher had not apprised counsel of his plans to use the
 insurance companies' funds to satisfy pre-existing liens. In
 particular, the district court pointed to the fact that Christopher
 ordered Fleet Bank to disburse the LACOP annuity funds without
 relying on counsel.
 Christopher responds that there was a sufficient
 predicate in the evidence to require the giving of this
 instruction. He points to the fact that numerous lawyers were
 involved at every step of the acquisitions, including the
 restructuring of the Windbrook and Mydar loans. In letters to both
 his own attorneys and to Resolute's, Christopher claims to have
 fully disclosed his intention to use the insurance companies'
 assets to pay off the pre-existing liens, and to inflate the
 purchase price of Desert Aire. 
 We doubt that Christopher made a sufficient showing of
 good faith reliance on counsel to justify a finding in his favor on
 that basis. But we need not decide the issue since we have held
 that "[a] separate instruction on good faith is not required in
 this circuit where the court adequately instructs on intent to
 defraud." United States v. Camuti, 78 F.3d 738, 744 (1st Cir.
 1996). The district court told the jury here that conviction
 required a finding that Christopher "knowingly" participated in a
 scheme to defraud, and defined "knowingly" to mean an act done
 "voluntarily and intentionally and not because of mistake or
 accident or other innocent reason." Moreover, the court instructed
 the jury that Christopher was guilty only if he "knew he was
 violating the law." Similar instructions were given on the counts
 for interstate transportation of stolen goods. Because the
 district court's instructions "sufficiently convey[ed] the
 defendant's theory," United States v. DeStefano, 59 F.3d 1, 2-3
 (1st Cir. 1995) (citation omitted), the refusal to give a reliance-
 of-counsel instruction was not error.
 D. Requested Jury Instruction on Limited Use of Evidence of Administrative Violations
 
 Christopher requested an instruction that would have told
 the jury that (1) a violation of an administrative order did not
 compel the conclusion that defendant had committed the charged
 offense and (2) any evidence of such a violation goes only to the
 defendant's intent to commit the crime. The court gave the first
 half of this instruction, charging the jury that "violation of an
 insurance regulatory order is not itself a crime," but not the
 second part, instead telling the jury that it "may consider all
 evidence or lack of evidence of such a violation in determining
 whether the Defendant committed the offenses charged in the
 indictment." This instruction, Christopher argues, permitted the
 jury to apply the evidence of the regulatory violations directly to
 the actus reus of the offense. 
 Taking the instructions as a whole, as they must be
 taken, see United States v. Arcadipane, 41 F.3d 1, 8 (1st Cir.
 1994), they did not encourage the jury simply to equate a violation
 of the regulatory orders with the commission of wire fraud. That
 much was evident based on the instruction that "[t]he violation of
 an insurance regulatory order is not itself a crime." Wire fraud
 was described as the "transmission of a wire communication in
 interstate commerce in furtherance of a scheme to defraud." A
 rational jury could scarcely have applied the evidence of
 regulatory violations to elements other than whether Christopher
 knowingly participated in a scheme to defraud and whether he did so
 with a specific intent to defraud. 
 E. Sentencing and Restitution
 Using the 1988 Sentencing Guidelines, the district court
 sentenced Christopher to 121 months' imprisonment and ordered him
 to pay restitution of $26.7 million. The district court increased
 the base offense level of six, see U.S.S.G. 2F1.1 (1988), on
 several grounds: eleven levels because Christopher caused a loss
 of over $5 million; five additional levels for the total loss of
 $26.7 million; two levels for Christopher's causing Diamond to
 become insolvent; one level for a violation of regulatory orders;
 and one level for causing a lack of investor confidence in Diamond
 and American.
 Christopher attacks his sentencing on several fronts. We
 consider each in turn.
 1. Calculation of Loss
 The district court calculated a total loss of $26.7
 million by totaling up the monies Christopher siphoned from Diamond
 and American in payment of the companies' purchase price and to
 clear liens on collateral for the notes. These consisted of the
 so-called Windbrook/Hilltop "loan" proceeds ($18 million), the
 Mydar "loan" ($5.4 million) and the overpayment for Desert Aire
 ($3.3 million). 
 Christopher argues that the trial court erred in failing
 to undertake any actual loss computation, in light of evidence
 showing offsetting economic value to Diamond and American,
 especially the remaining value of the collateral. Under the
 "economic reality approach" adopted by other courts, see United
 States v. Kopp, 951 F.2d 521, 531 (3d Cir. 1991), Christopher
 contends, the loss calculation must be based on the net economic
 loss caused or intended by the defendant. He also places some
 weight on Application Note 7(b) to 2F1.1 (providing that "[i]n
 fraudulent loan application cases and contract procurement cases,
 the loss is the actual loss to the victim").
 The short answer to this argument is that these sums that
 Christopher caused to be siphoned from American and Diamond were
 actual "net" losses, not merely gross losses. Had the deal
 proceeded as the regulators anticipated, and as Christopher
 represented, these large amounts of cash would not have been
 diverted from the two companies while, at the same time, the Reeder
 and Mydar notes to the companies would have been secured by
 encumbrance-free collateral, the encumbrances having been cleared
 by outside funds prior to the closings. Christopher and Resolute
 promised to deliver to the companies the capital embodied in the
 promissory notes, backed by lien-free collateral. While the
 companies eventually gained the senior security interest in the
 collateral, they did so only after paying from their own depleted
 funds the $26.7 million which, were it not for Christopher's fraud,
 they would have kept. To reduce the loss by the value of the
 foreclosed collateral, as Christopher urges, would double count: 
 the insurance companies were entitled to the protection of lien-
 free collateral without having to reduce their own capital in order
 to pay off the liens. The actual loss was, therefore, the $26.7
 million taken from the companies.
 Christopher argues that the district court erred in
 blaming him for the full $26.7 million loss and in not taking into
 account other causes of the financial harm to American and
 Diamond. The loss figures in the Guidelines are based on the
 assumption that "the defendant alone is responsible for the entire
 amount of the victim loss." United States v. Gregorio, 956 F.2d
 341, 347 (1st Cir. 1992). Christopher points to evidence presented
 at trial of two other causes for Diamond's and American's losses: 
 (1) their poor insurance practices before and after his short
 tenure, and (2) the role of Wayne Reeder, Resolute's majority
 owner, who owned the properties that served as collateral for the
 acquisitions (and which were encumbered by liens of over $21
 million), as compared with the $548,000 of lien obligations on
 Mydar-related (and Christopher-owned) properties. 
 The district court's decision not to reduce the loss
 amount in light of these other factors was not an abuse of
 discretion. That Christopher diverted $26.7 million from the two
 insurance companies was not attributable to the companies'
 insurance practices. And Reeder's pre-existing liens were not an 
 independent cause of the losses. At most they were an incentive
 for the theft. Christopher himself took the lead in moving the
 scheme along every step toward completion. Because the losses
 would not have occurred without Christopher's actions, the court
 was not required to consider other causes in calculating the loss.
 2. Calculation of Restitution
 Under the version of the statute applicable to
 Christopher's case, "the court shall not impose restitution with
 respect to a loss for which the victim has received or is to
 receive compensation." 18 U.S.C. 3663(e)(1) (1988) (repealed
 1996). Christopher points out several aspects of his scheme that
 resulted in the insurance companies' receiving some remuneration. 
 One error below is stipulated: the government agrees with
 Christopher that restitution of the entire $5.4 million of the
 Mydar loan is inappropriate because the only counts in the
 indictment relating to that loan (Counts 5 (wire fraud) and 20
 (interstate transportation of stolen property)) involved a wire
 transfer of only $138,000. Thus, restitution should have been at
 most $21,438,000 rather than $26,600,000 as ordered below. 
 Although Christopher failed to make this argument below, the
 government concedes that it is plain error to impose restitution
 based on losses for which the defendant was not charged in the
 indictment. See United States v. Gilberg, 75 F.3d 15, 20-22 (1st
 Cir. 1996).
 Otherwise, the calculation of restitution was correct. 
 Christopher claims that the district court should have reduced the
 total by the amount of income that American has received from
 Desert Aire, or ignored the Desert Aire purchase altogether since
 the value of the property and time share notes equals the amount
 American actually paid. This, however, ignores the simple fact
 that American was $3.3 million the worse for his inflation of the
 Desert Aire purchase price. Had he been honest, American would
 have received an identical return from the property and given up
 $3.3 million less in the process.
 Similarly, Christopher points to the fact that, as part
 of a post-receivership settlement with American, Diamond was
 scheduled to receive title to the Heritage Ranch collateral. 
 Again, Christopher attempts to get extra credit for providing
 Diamond with what rightfully belonged to it. See E.1, supra. 
 For the reasons already described, we reject Christopher's claim. 
 3. Upward Departure Based on Christopher's Causing the 
 Insurance Companies To Become Insolvent
 
 Finally, Christopher attacks as clearly erroneous the
 district court's finding that Christopher caused Diamond's
 insolvency. Christopher notes that, prior to its acquisition by
 Resolute, Diamond had a negative net worth. Moreover, in its
 "version of the offense" included in the PSI, the government
 conceded that without additional capital, Diamond would be
 insolvent. Absent the monies provided by the Hilltop and Mydar
 loans, Christopher argues, Diamond would have continued to be
 insolvent. 
 However, Diamond's receiver testified at sentencing that
 the loss of the $18 million left Diamond insolvent. Although the
 receiver also testified that Diamond was "struggling" with its cash
 flow during the summer of 1988, it remained, in his view, "viable"
 until it was deprived of the $18 million. The fact that Diamond
 would have been insolvent without an infusion of cash is precisely
 the point: the regulators would never have approved the
 acquisition were it not for Resolute's promises to put money into
 the company. Instead, Christopher caused Diamond to assume $30
 million in new annuity obligations from LACOP and took the purchase
 price to pay for obligations that he had caused Diamond to assume. 
 Christopher's position ignores what a responsible officer would
 have done with the LACOP annuity funds: use them to improve
 Diamond's already precarious financial position. Instead,
 Christopher used the money to secure Resolute's control of Diamond,
 at a large net loss to Diamond. The $18 million was greater than
 the $15 million California regulators thought necessary to
 revitalize the company, so Christopher's dissipation of those funds
 can reasonably be viewed as a but-for cause of Diamond's
 insolvency. Thus, the district court made a choice among
 supportable alternatives, and that choice was not clearly
 erroneous.
 III. Conclusion
 We modify the restitution order consistent with this
 opinion. Subject to that modification, the convictions and
 sentences are otherwise affirmed.