# United States Court of Appeals
## For the First Circuit

No. 21-1858

DAVID EFRON,

Plaintiff, Appellant,

v.

UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO; UBS
FINANCIAL SERVICES INC.; LUZ NEREIDA COLÓN; ENEIDA RODRÍGUEZ;
HECTOR SUEIRO-ALVAREZ,

Defendants, Appellees.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. William G. Young,* U.S. District Judge]

———————————

Before

Barron, Chief Judge,
Lipez and Montecalvo, Circuit Judges.

———————————

Alfredo Fernández-Martínez, with whom Delgado & Fernández,
LLC was on brief, for appellant David Efron.
Amy Mason Saharia, with whom Christopher N. Manning, Michael
R. Fishman, and Williams & Connolly LLP were on brief, for
appellees UBS Financial Services Incorporated of Puerto Rico, UBS
Financial Services Inc., Luz Nereida Colón, Eneida Rodríguez, and
Hector Sueiro-Alvarez.

———————————

March 20, 2024

———————————

* Of the District of Massachusetts, sitting by designation.

**MONTECALVO, Circuit Judge**. Plaintiff-appellant David Efron ("Efron") sought to bring a Racketeer Influenced and Corrupt Organizations Act ("RICO") claim and various Puerto Rico law claims against defendant-appellees UBS Financial Services Incorporated of Puerto Rico, UBS Financial Services Inc., Luz Nereida Colón ("Colón"), Eneida Rodríguez, and Hector Sueiro-Alvarez,[1] alleging that they illegally disclosed his private bank account information to his ex-wife, Madeleine Candelario Del Moral ("Candelario"). Efron contends that UBS's disclosure triggered extensive litigation over Candelario's entitlement to Efron's assets housed at UBS and eventually led to UBS seeking millions in indemnification from Efron. UBS moved to dismiss the complaint, and the district court both denied Efron leave to file a second-amended complaint on futility grounds and dismissed the case. Efron now appeals the district court's dismissal of the case, its ruling limiting his pre-dismissal discovery to two depositions, and its denial of his motion for leave to amend. Meanwhile, UBS has moved for sanctions against Efron for filing what it contends is a frivolous appeal.

For the reasons explained below, the district court did not abuse its discretion in limiting Efron to deposing only two

---

[1] For consistency and to avoid confusion, we refer to defendant-appellees collectively as "UBS" and specifically identify individual defendant-appellees where necessary.

UBS employees before requiring him to file a proposed second-amended complaint. We also agree with the district court that permitting Efron to amend his complaint would be futile. We therefore affirm the district court's dismissal of Efron's RICO claim. Lastly, while Efron's grounds for appeal were weak, we decline to take the drastic measure of imposing sanctions.

## I. Background

On appeal from the district court's dismissal of Efron's claims, "[w]e take all facts pled, as well as all reasonable inferences to be drawn therefrom, in the light most favorable to" Efron. Butler v. Deutsche Bank Tr. Co. Ams., 748 F.3d 28, 32 (1st Cir. 2014).

In 1999, Efron and Candelario filed for divorce in the Puerto Rico Court of First Instance ("CFI"). The divorce was finalized on June 4, 2001,[2] but Candelario's ability to obtain Efron's assets following the divorce has been the subject of complex and still-ongoing litigation. As part of the CFI's divorce judgment, Efron was required to pay Candelario $50,000 per month beginning on June 4, 2001.

---

[2] At points in his briefing and proposed second-amended complaint, Efron states that his divorce was finalized in May 2001. The exact date of the divorce is not relevant here. But we note this inconsistency and rely on June 4, 2001 as the date the divorce was finalized because Candelario's subpoena to UBS requested Efron's financial documents pre-dating June 4, 2001.

In 2005, Candelario sued Efron in the CFI alleging that he had not made any monthly payments in accordance with the divorce judgment. During discovery in Candelario's lawsuit, the CFI barred Candelario from requesting documents related to Efron's assets obtained after the divorce was finalized. Specifically, the CFI ruled that Candelario could not seek third-party discovery on Efron's financial assets "subsequent to the date of the divorce."

Of particular relevance here, in 2002, Efron opened three investment accounts with UBS after the divorce was finalized. Accordingly, the CFI's limiting order should have precluded Candelario from learning of these three post-divorce UBS accounts. In August 2005, Candelario's attorneys subpoenaed UBS for documents related to Efron's UBS accounts. And pursuant to the CFI's limiting order, the subpoena requested only information up to June 4, 2001. Despite this limitation, however, UBS produced documents post-dating June 4, 2001, including information on Efron's three UBS accounts opened in 2002.

Efron alleges that UBS disclosed a total of 324 documents that exceeded the scope of the subpoena and violated the CFI's limiting order. Furthermore, Efron maintains that he informed UBS of the CFI's limiting order before Candelario issued her subpoena; UBS never sought his consent before responding to the subpoena; UBS intentionally excluded his UBS financial advisor, Miguel Coll del Río ("Coll"), from conversations regarding disclosure of

Efron's account information to Candelario; and UBS employees later attempted to cover up the overproduction when Efron confronted them. Efron also contends that as part of UBS's cover-up scheme, UBS lied to Coll about the overproduction because it knew Coll would reveal the misconduct to Efron if he knew the truth.

Upon learning that Efron had opened accounts at UBS post-divorce, Candelario obtained an attachment order from the CFI for Efron's UBS assets. In August 2007, the CFI issued an Order on the Sale of Assets ("the Order"), requiring UBS to freeze Efron's three accounts and instructing it "to immediately sell and liquidate the bonds, shares and securities in its custody" from those accounts. After liquidation, UBS was ordered to write a check for $4,160,522.61 to Candelario. The Order further "exempted [UBS] from any loss [Efron] may suffer as a consequence of the sale" of his UBS assets and forbade Efron from "alienating, selling, transferring or pledging the assets that are in the custody of UBS."

Candelario did not receive the money from UBS as contemplated by the Order. In 2008, Candelario sued UBS in federal district court in Puerto Rico, alleging that, rather than abiding by the Order, UBS "negligently released the restraints imposed on Efron's accounts by [the Order], allowing Efron to transfer millions of dollars in assets elsewhere and evade her collection efforts." As this court noted in Efron's prior appeal related to

Candelario's 2008 suit against UBS, at one point, Efron's UBS accounts "had more than $11,000,000." In re Efron, 746 F.3d 30, 33 (1st Cir. 2014). But Candelario maintained that UBS wrongfully "treated [the Order] as void," which permitted Efron to disburse his UBS assets, leaving "insufficient funds remaining to satisfy Candelario's demands." Id. In 2016, the district court entered judgment in favor of Candelario, awarding her $4,725,629 against UBS. UBS later settled with Candelario for $4,450,000, an agreement that Efron insists was "carefully planned" as "part of a scheme to . . . make Efron liable" for UBS's wrongdoing.

In January 2017, UBS sought indemnification from Efron for its settlement with Candelario by initiating arbitration against him with the Financial Industry Regulatory Authority ("FINRA"). The FINRA arbitrators initially issued a $9,721,050.65 award to UBS after Efron failed to appear for arbitration. But in 2020, a Florida appeals court reversed the decision because the FINRA arbitrators rejected Efron's request for a postponement to obtain new counsel without justification and thus improperly denied him an adequate opportunity for representation at the arbitration hearing. In a Rule 28(j) letter filed on October 24, 2023, UBS noted that, over Efron's objections, a federal district court in Florida recently confirmed the FINRA arbitrators' revised award of $6,480,854.80 to UBS.

Efron filed this lawsuit against UBS on June 13, 2019, but he amended his complaint before service in December 2019. Efron raised a RICO claim and various Puerto Rico law claims stemming from UBS's overproduction of documents to Candelario. UBS moved to dismiss Efron's first-amended complaint on February 28, 2020.  After UBS's motion to dismiss was filed, the parties disputed the extent to which Efron should have been permitted to engage in pre-dismissal discovery in responding to UBS's motion and preparing to file a second-amended complaint.  Efron sought to compel the depositions of eleven UBS agents, while UBS opposed Efron's motion to compel and moved to stay discovery pending resolution of the motion to dismiss.  The district court indicated its intent to rule on the discovery issue at the motion to dismiss hearing if the parties could not reach an agreement.

At the motion to dismiss hearing, the court found Efron's RICO allegations to be "simply inadequate," such that the court felt it was "bending over backwards to give [Efron] every chance to file a viable cause of action."  Because the court considered even four or five depositions to be "hardly limited" discovery, it permitted Efron to take only two depositions of the UBS employees Efron considered "most important."

In support of his proposed second-amended complaint, Efron deposed Coll (his UBS financial advisor) and Eneida Rodríguez (a UBS employee involved in the Candelario document disclosure).

After deposing Coll and Rodríguez, Efron moved for leave to file a second-amended complaint on July 19, 2021. Efron prefaced his proposed second-amended complaint by stating that "more discovery will be needed to prove all of the allegations." Nonetheless, he maintained that he had "enough information now to comply with the RICO specificity requirements."

The district court denied Efron's motion for leave to amend in a text-only order stating that amendment would be "futile" as "the proposed second[-]amended complaint fails to state a cause of action for violations of the RICO statute." And by declining to exercise supplemental jurisdiction over Efron's Puerto Rico law claims, the court dismissed Efron's case in its entirety.[3] On September 29, 2021, the district court entered an order dismissing Efron's case. Efron filed a timely notice of appeal on October 8, 2021.

Concurrently with filing its response brief on appeal, UBS moved for sanctions against Efron, alleging that the present appeal is frivolous and UBS is entitled to fees and costs for defending against it. UBS's sanctions motion has since been fully briefed and reserved for decision by this panel.

---

[3] On appeal, Efron challenges only the dismissal of his RICO claim.

## II. Discussion

### A. The District Court's Limitation of Efron's Pre-Dismissal Discovery

We begin by assessing the district court's decision to limit Efron's pre-dismissal discovery to two depositions. A district court's order limiting discovery is reviewed for abuse of discretion. U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P., 719 F.3d 31, 37 (1st Cir. 2013). This court "will intervene in such matters only upon a clear showing of manifest injustice, that is, where the lower court's discovery order was plainly wrong and resulted in substantial prejudice to the aggrieved party." Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 186 (1st Cir. 1989).

Efron argues that the district court "arbitrarily denied" his request to take eleven depositions before filing a proposed second-amended complaint. And he insists that the two depositions to which he was limited did not constitute sufficient pre-dismissal discovery as contemplated by this court's decision in New England Data Services, Inc. v. Becher, 829 F.2d 286 (1st Cir. 1987).

In Becher, we held that, where allegations supporting a RICO claim do not satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b), a court should not "automatic[ally]" dismiss the claim. 829 F.2d at 290. Instead, if the complaint raises "specific allegations . . . [that] make it likely that the

- 9 -

defendant used interstate mail or telecommunications facilities" and the court finds "specific information as to use [of interstate mail or telecommunications] is likely in the exclusive control of the defendant," the court "should make a second determination as to whether the claim as presented warrants the allowance of discovery."  Id.  Put simply, Becher discovery assists the plaintiff in accessing information to allow them "to plead the time, place and contents of communications between the defendants" with sufficient particularity.  Id. at 291.

This court later emphasized that "Becher discovery (with concomitant leave to amend) 'is neither automatic, nor of right, for every plaintiff.'"  Cordero-Hernández v. Hernández-Ballesteros, 449 F.3d 240, 244 (1st Cir. 2006) (quoting Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997)).  For example, in North Bridge Associates, Inc. v. Boldt, 274 F.3d 38 (1st Cir. 2001), we upheld the district court's denial of Becher discovery by concluding that "[t]his is not a case to which the generosity of our approach in Becher is applicable."  Id. at 44.  The North Bridge court concluded that the plaintiffs failed to raise specific allegations of interstate communications and their complaint ultimately lacked "the substance of a RICO claim."  Id.; see also Douglas v. Hirshon, 63 F.4th 49, 59-60 (1st Cir. 2023) (affirming denial of Becher discovery where the plaintiff's complaint failed

to allege RICO claims with sufficient particularity under Rule 9(b) and the "ordinary plausibility standard").

Even assuming that Efron was entitled to Becher discovery, he has not presented us with any cases suggesting that limiting his pre-dismissal discovery to two depositions was an abuse of discretion. Pursuant to Federal Rule of Civil Procedure 30(a)(2), during the course of ordinary discovery, Efron would have needed to seek leave of court to take eleven total depositions and provide sufficient justification for exceeding discovery limits. Yet nothing in the record demonstrates that Efron adequately supported his request for such extensive pre-dismissal discovery, nor has he articulated why he needed additional discovery on appeal.

And in filing his proposed second-amended complaint, Efron attested that he had obtained "enough information . . . to comply with the RICO specificity requirements." This admission, along with the fact that he never sought leave for additional discovery before filing the proposed second-amended complaint, gravely undermines or entirely waives Efron's position on appeal that taking two depositions was insufficient. See United States v. Mayendía-Blanco, 905 F.3d 26, 32 (1st Cir. 2018) (deeming an argument waived when a party intentionally relinquishes or abandons it). Therefore, Efron plainly fails to show that the

district court abused its discretion in limiting his pre-dismissal discovery.

## B. The District Court's Denial of Efron's Motion for Leave to Amend

We now turn to whether the district court properly denied Efron's motion for leave to amend and dismissed his case.[4]  This court's review of "the district court's dismissal of [Efron's] claims is de novo, and the denial of leave to amend further is reviewed for abuse of discretion." Pruell v. Caritas Christi, 678 F.3d 10, 12 (1st Cir. 2012) (citations omitted).

If the district court's judgment is supported by an "adequate reason for the denial," we defer to the decision. Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 58 (1st Cir. 2006). As relevant here, a district court may properly deny leave to amend when it "would be an exercise in futility."  Id.

To assess whether a proposed amended complaint withstands a Rule 12(b)(6) motion (and thus whether leave to amend was futile), this court "must accept as true all well-pleaded facts 'indulging all reasonable inferences in [Appellant's] favor.'"

---

[4]    Efron's appeal also nominally challenges the district court's dismissal of his first-amended complaint, but all of Efron's contentions in his opening brief relate exclusively to his challenge to the district court's denial of his motion for leave to amend.  Thus, any argument that Efron's first-amended complaint sufficed to state a claim and should not have been dismissed is waived for lack of development. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

<u>Fantini</u> v. <u>Salem State Coll.</u>, 557 F.3d 22, 26 (1st Cir. 2009) (alteration in original) (quoting <u>Nisselson</u> v. <u>Lernout</u>, 469 F.3d 143, 150 (1st Cir. 2006)). Of critical importance here, a complaint raising RICO claims predicated on mail and wire fraud must satisfy Rule 9(b)'s particularity requirements. <u>Becher</u>, 829 F.2d at 290. Specifically, Rule 9(b) mandates that "the complaint 'must state the time, place and content of the alleged mail and wire communications perpetrating that fraud.'" <u>Douglas</u>, 63 F.4th at 55 n.7 (quoting <u>Ahmed</u>, 118 F.3d at 889).

To raise a civil RICO claim, "a plaintiff must allege 'a violation of section 1962' and an injury 'by reason of' that violation." <u>Lerner</u> v. <u>Colman</u>, 26 F.4th 71, 77 (1st Cir. 2022) (quoting 18 U.S.C. § 1964(c)). Efron's RICO claim is premised on a violation of 18 U.S.C. § 1962(c), which requires showing that "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Efron also alleges a conspiracy to violate RICO under 18 U.S.C. § 1962(d). Accordingly, the four key elements of a RICO claim (which also constitute the underlying substantive offense for a RICO conspiracy claim) are: "(1) conduct (2) of an enterprise (3)

- 13 -

through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985).

Efron insists that the district court abused its discretion in denying his motion for leave to file a second-amended complaint for futility. UBS argues that Efron's RICO allegations were deficient in three main ways: (1) failure to allege a RICO enterprise; (2) failure to allege predicate acts of mail or wire fraud; and (3) failure to allege a pattern of racketeering activity. Any one of these is independently fatal to Efron's RICO claim. As discussed below, we find that Efron's failure to plausibly allege predicate acts of mail or wire fraud warrants affirmance of the district court's denial of leave to amend for futility.

Even assuming Efron had plausibly alleged a RICO enterprise in the second-amended complaint, he cannot satisfy RICO's predicate acts element. Efron's proposed second-amended complaint relies on mail or wire fraud as the predicate racketeering acts for his RICO claim. See 18 U.S.C. § 1961(1). To establish mail or wire fraud, Efron was required to show that UBS "engaged in a scheme to defraud with the specific intent to defraud and that [it] used the United States mails and/or the interstate wires in furtherance of the scheme." McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786, 790 (1st Cir. 1990). In particular, "the scheme must be intended to deceive

- 14 -

another, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct." Id. at 791 (emphasis added).

Construing the proposed second-amended complaint in the light most favorable to Efron, the three primary predicate acts of mail or wire fraud he alleges are: (1) UBS's overproduction of Efron's account information in response to Candelario's subpoena; (2) UBS's alleged cover-up of the overproduction; and (3) UBS's subsequent FINRA litigation seeking indemnification from Efron after it settled with Candelario.

As to UBS's overproduction of documents, Efron fails to plausibly demonstrate how this conduct -- which may constitute negligence, breach of contract, or breach of fiduciary duty -- can be construed as mail or wire fraud. A "breach of a fiduciary duty, standing alone, does not constitute mail fraud." United States v. Greenleaf, 692 F.2d 182, 188 (1st Cir. 1982). "Nor does a breach of contract in itself constitute a scheme to defraud." McEvoy Travel Bureau, Inc., 904 F.2d at 791; see also Arzuaga-Collazo v. Oriental Fed. Sav. Bank, 913 F.2d 5, 6 (1st Cir. 1990) ("This complaint reads as if it is charging a breach of contract or a violation of a consumer protection law, not racketeering.").

Relatedly, Efron ignores the fact that the falsity of a statement alone is inadequate to demonstrate fraudulent intent. Efron is correct that the alleged wire communication between UBS

agents regarding the scope of documents necessary to respond to Candelario's subpoena was inaccurate because it failed to include the CFI's restriction on documents post-dating June 4, 2001. But Efron does not plausibly establish that UBS's communications were made with the intent to defraud him. Rule 9(b) "requires not only specifying the false statements and by whom they were made but also identifying the basis for inferring scienter." N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 13 (1st Cir. 2009). Besides conclusory allegations as to UBS's fraudulent intent in disclosing the documents to Candelario, Efron's proposed second-amended complaint does not credibly suggest that UBS acted with specific intent to deceive. Cf. Mendez Internet Mgmt. Servs., Inc. v. Banco Santander de P.R., 621 F.3d 10, 15 (1st Cir. 2010) (rejecting the plaintiff's attempt to establish predicate acts through mail or wire fraud because "[e]ven if the [defendants] were implicitly misrepresenting their motive . . . , it is not the falsity of their excuse that causes [the plaintiff] damage").

Similarly, Efron's allegations regarding UBS's purported cover-up following its overproduction do not satisfy the particularity or plausibility standards. While the record reflects that a few communications were made via email, satisfying Rule 9(b)'s requirement for pleading the communications' time, place, and contents, Efron has not plausibly alleged how those statements were fraudulent. Indeed, in these internal email

communications, the individual defendant-appellees and other UBS employees appear to be conceding that they made the overproduction.

Additionally, the statements that could most arguably be construed to have been intentionally deceptive were not pled with particularity nor do they satisfy the basic elements of mail or wire fraud. For example, the proposed second-amended complaint refers to statements that Sueiro-Alvarez and Colón made to Coll falsely denying the overproduction. But Efron alleged that several of these communications were made in-person, meaning they cannot constitute mail or wire fraud acts. See Giuliano v. Fulton, 399 F.3d 381, 388 (1st Cir. 2005) (explaining that, because "[m]any of the specific allegations of fraud do not implicate the mail or the wires," the plaintiff could not rely on such allegations to establish "a RICO predicate act"); Fleet Credit Corp. v. Sion, 893 F.2d 441, 445 (1st Cir. 1990) ("[A]cts of common law fraud that do not implicate the mails (or the wires) do not constitute 'racketeering activity' under the definition found within the RICO statute."). As for the rest of the communications, Efron's allegations suffer from a host of other issues, including failure to specify the manner in which they were made, conclusory statements regarding fraudulent intent, and neglecting Rule 9(b)'s requirement for details as to time and place. See Ahmed, 118 F.3d at 889; cf. Efron v. Embassy Suites (P.R.), Inc., 223 F.3d 12, 16 n.4 (1st Cir. 2000) (noting, in another RICO case that Efron

brought before this court, the district court's refusal to consider "seven faxes because Efron failed to allege that they had been transmitted interstate").

Efron's reliance on UBS's FINRA litigation as a predicate act of mail or wire fraud fares no better. As with the cover-up theory, Efron's conclusory allegations that UBS nefariously plotted against him do not plausibly demonstrate that UBS initiated the FINRA litigation with intent to defraud. In fact, inferring fraudulent intent with respect to any of these alleged predicate acts would require giving legitimacy to Efron's theory that, by disclosing his financial information to Candelario in 2005, UBS knew that it would be able to recover against him nearly two decades later. But as discussed above, Efron's proposed second-amended complaint provides no basis for accepting such a far-fetched scheme as plausible. See Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir. 1985) ("[M]ere allegations of fraud, corruption or conspiracy, averments to conditions of mind, or referrals to plans and schemes are too conclusional to satisfy the particularity requirement, no matter how many times such accusations are repeated.").

The district court was within its discretion to conclude that permitting the amendment would be futile because, even after taking pre-dismissal depositions, Efron still could not plead fraud with sufficient particularity. See Giuliano, 399 F.3d at

388 ("We will not imply or read into the amended complaint the mail or wire connection where it is not alleged specifically."). Therefore, the district court appropriately concluded that Efron's inability to allege viable predicate acts rendered amendment futile.

Efron's "[f]ailure to plead predicate acts adequately is enough to sink his RICO claim." Ahmed, 118 F.3d at 889. Consequently, without a viable underlying RICO claim, accepting the proposed second-amended complaint's RICO conspiracy claim would also have been futile. See Efron, 223 F.3d at 21 ("[I]f the pleadings do not state a substantive RICO claim upon which relief may be granted, then the conspiracy claim also fails.").

### C. UBS's Motion for Sanctions

UBS has moved for sanctions against Efron for filing what it considers to be a frivolous appeal. Pursuant to Federal Rule of Appellate Procedure 38, if this court "determines that an appeal is frivolous, it may, after a separately filed motion . . . and reasonable opportunity to respond, award just damages and single or double costs to the appellee." "In order to find that an appeal is frivolous, we need not find that it was brought in bad faith or that it was motivated by malice." E.H. Ashley & Co. v. Wells Fargo Alarm Servs., 907 F.2d 1274, 1280 (1st Cir. 1990). Instead, "it is enough that the appellants and their attorney

should have been aware that the appeal had no chance of success." Id.

In its sanctions motion, UBS insists that Efron's briefing failed to comply with Federal Rule of Appellate Procedure 28, his arguments are meritless, and he filed the appeal "for the improper purpose of harassing and imposing litigation costs upon UBS."

In a prior case involving Efron's attempted intervention in Candelario's lawsuit against UBS, this court declined to impose sanctions against Efron but warned that he "came perilously close" to committing sanctionable conduct. In re Efron, 746 F.3d at 38. We noted that his case was "manifestly weak," while emphasizing that "'weak' is not synonymous with 'frivolous.'" Id. We further described that the "case-specific nature" of the issues presented "counsel[ed] against saying that Efron 'had no legitimate ground for pursuing this appeal.'" Id. (quoting E.H. Ashley & Co., 907 F.2d at 1280).

Here, Efron's case was similarly weak, but contrary to UBS's contentions, it involved case-specific issues that were not so squarely resolved in his prior appeal on a different RICO claim (Efron v. Embassy Suites (P.R.), Inc., 223 F.3d 12 (1st Cir. 2000)). And while UBS was burdened by litigating this appeal and

- 20 -

its troubled history with Efron is clear from the record, its allegations of malintent fall short.[5]

As such, we decline to impose sanctions against Efron. But once again, we conclude that he has come dangerously close to crossing the line. And we reiterate that, where an appeal is genuinely frivolous and "appellant's brief added a significant burden on appellee's counsel and the court," we have not hesitated to sanction the appellant. Commonwealth Elec. Co. v. Woods Hole, 754 F.2d 46, 49 (1st Cir. 1985). Efron is therefore admonished to avoid coming "perilously close" to being sanctioned for a third time.

### III. Conclusion

For the foregoing reasons, we affirm the district court's ruling limiting Efron's pre-dismissal discovery and its order denying Efron leave to file a second-amended complaint and dismissing his case, and we deny UBS's motion for sanctions.

---

[5]     UBS also points to numerous other cases where Efron, as a litigant or counsel, has had RICO claims dismissed or been sanctioned for various misconduct. But UBS offers no authority to support using Efron's conduct in other cases as the basis for sanctions here.