# United States Court of Appeals
## For the First Circuit

No. 24-1973

GAVEN MCKENNA, by and through his co-guardians Steven and
Catherine McKenna; JARED MCKENNA, by and through his
co-guardians Steven and Catherine McKenna,

Plaintiffs, Appellants,

v.

MAINE DEPARTMENT OF HEALTH & HUMAN SERVICES,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

---

Before

Montecalvo, Kayatta, and Aframe,
Circuit Judges.

---

Richard L. O'Meara, with whom Ellen P. Masalsky and Murray,
Plumb & Murray were on brief, for appellants.
Kelly L. Morrell, Assistant Attorney General, with whom Aaron
M. Frey, Attorney General of Maine, Thomas A. Knowlton, Deputy
Attorney General, and Kevin J. Beal, Assistant Attorney General,
were on brief, for appellee.

---

August 18, 2025

---

**MONTECALVO, <u>Circuit Judge</u>.** Brothers Gaven and Jared McKenna, through their parents, Catherine and Steven McKenna (collectively, the "McKennas"), sued Maine's Department of Health and Human Services (the "Department"), alleging that the Department discriminated against each brother in violation of federal law. Both brothers have developmental disabilities and receive aid from the Department. The McKennas allege that because the brothers lived together the Department provided less aid than it would have had they lived apart thereby violating each brother's constitutional right to associate. The district court dismissed the matter, agreeing with the Department that sovereign immunity protects it from suit. The McKennas appeal that judgment. For the reasons provided below, we conclude that the Department is not entitled to sovereign immunity, and, accordingly, we reverse.

## I. Background[1]

Both Gaven and Jared have been diagnosed with intellectual disabilities. Gaven "has a diagnosis of autism and moderate to severe intellectual disabilities," is nonverbal, and experiences incontinence. Jared "has a diagnosis of autism, moderate intellectual disabilities, and generalized anxiety

---

[1] On appeal from the dismissal, "[w]e take all facts pled, as well as all reasonable inferences to be drawn therefrom, in the light most favorable to" the McKennas. <u>Efron</u> v. <u>UBS Fin. Servs. Inc. of P.R.</u>, 96 F.4th 430, 433 (1st Cir. 2024) (quoting <u>Butler</u> v. <u>Deutsche Bank Tr. Co. Ams.</u>, 748 F.3d 28, 32 (1st Cir. 2014)).

disorder." Both brothers require twenty-four-hour supervision and assistance with all aspects of daily life. They live at their family home with their parents, Catherine and Steven.

### A. The Department's Determination of Services

Because of their disabilities, Gaven and Jared each qualify to receive Department-provided services, including institutional- or community-based care. They were notified of their eligibility to receive services in a community-based setting in June 2018. Per the complaint, both brothers qualified for and were recommended to receive "Shared Living Services" at the "Single Member Services" level. In Shared Living, a direct support professional ("DSP") who shares a home with the services recipient provides the Department's services. Under Single Member Services, a services recipient receives one-on-one care.

Both Catherine and Steven McKenna are certified DSPs, able to provide Shared Living Services under the Department's rules. Accordingly, the McKennas requested that each brother receive Single Member Services at home, with Steven as Gaven's DSP and Catherine as Jared's. But in August 2018, the Department only approved Catherine as Jared's DSP and denied Gaven the ability to apply for Single Member Services with Steven as his DSP until May 2019.

Then, in August 2019, after Gaven applied for Single Member Services, the Department informed the brothers that they

had instead been approved for "Two Member Services," meaning that the brothers would share a single DSP rather than each brother having his own designated DSP. The Department based its determination on its interpretation of the applicable regulations, which it read as preventing multiple members from receiving Single Members Services while residing together in one house. The Department's decision meant that Catherine and Steven could not both be reimbursed to provide care, such that either the brothers would need to share a single DSP or Catherine and Steven could both continue to provide one-on-one care with only one of them reimbursed for their work. As the McKennas allege, this was a financial blow to the brothers, as "[t]he reimbursement rate for one DSP providing Two Member Services is significantly lower than the reimbursement rate for two DSPs providing Single Member Services to [two] member[s]." The rate for Single Member Services is $156 per day, while the rate for Two Member Services is $78.02 per day. Although the Department reimbursed the McKennas for only one DSP providing Two Member Services, Catherine and Steven continued to provide Gaven and Jared with the one-on-one care that the brothers need. As a result, the McKennas allege, the brothers were denied "one-half of the services for which they are qualified and that are necessary for their health and safety."

The effect of this decision, the McKennas argue, is that the Department "prevented Gaven from receiving the disability

services to which he is entitled so long as he lived in the same home as his brother, Jared, and vice versa."

## B. State Lawsuit

In 2020, the McKennas sought review of the Department's services decision under Maine law in Maine Superior Court. And, in 2022, the superior court sided with the McKennas. The McKennas now allege that the district court "requir[ed] the Department to approve both [brothers] to receive the Single Member Services to which they were entitled despite the brothers' decision to live in the same home." As the McKennas allege, the court explained:

> [T]he rules authorize the Department to allow two [single]-member-serv[ices] relationships in a single home.
>
> . . .
>
> If, as the Department itself recognized, Gaven were to move to another home with a different Shared Living Provider (or, presumably, if the parents lived separately and he lived with his father under a separate roof) his services would be funded at the full stipend rate. This is arbitrary, unreasonable, and inconsistent with the values espoused by the Department policies of maximizing community inclusion in a Shared Living family environment.

After the state court issued its decision, the Department began reimbursing the McKennas for two DSPs providing Single Member Services to the brothers. This means that, since the July 2022 state court decision, both parents are now reimbursed for the around-the-clock care they provide to the brothers.

- 5 -

### C. The Federal Lawsuit

The McKennas initiated this lawsuit to recover for the time during which their reimbursement was limited to one DSP providing services to two members. They allege discrimination based on association with an individual with a disability in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12165 ("Title II").[2] In response, the Department filed a motion to dismiss for lack of subject-matter jurisdiction, arguing that Eleventh Amendment sovereign immunity barred the suit.[3]

The district court agreed with the Department and granted the Department's motion to dismiss. McKenna ex rel. McKenna v. Me. Dep't of Health & Hum. Servs., No. 23-CV-00366, 2024 WL 4333376, at *1 (D. Me. Sept. 27, 2024). As we will explain thoroughly below, the district court determined that the Department was entitled to immunity and dismissed the suit.

The McKennas timely appealed.

---

[2] The McKennas also alleged that the Department discriminated against the brothers in violation of Maine state law, namely the Maine Human Rights Act, Me. Stat. tit. 5, § 4592(6) (1995). But the parties later agreed that this claim did not belong in federal court, and it was dismissed.

[3] The Department also argued that the complaint should be dismissed for failure to state a claim, but the district court did not reach that argument because it agreed that it lacked subject-matter jurisdiction.

## II. Standard of Review

We review the district court's Eleventh Amendment immunity abrogation analysis de novo.  Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & the Caribbean Cardiovascular Ctr. Corp., 322 F.3d 56, 60-61 (1st Cir. 2003).

## III. Discussion

The McKennas argue that the district court erred in concluding that Eleventh Amendment immunity protected the Department and, in turn, erred in dismissing the case.  Given the complex nature of the law at hand, and because the district court accurately laid out the relevant framework, we begin by setting forth the applicable test and summarizing the district court's analysis at each step.  Finally, we assess the McKennas' arguments in favor of reversal.

### A. Legal Framework and the District Court's Decision

"'The Eleventh Amendment largely shields States from suit in federal court without their consent, leaving parties with claims against a State to present them, if the State permits, in the State's own tribunals.'  This immunity applies only to the states [and to] arms of a state."  Pastrana-Torres v. Corporación de P.R. para la Difusión Pública, 460 F.3d 124, 126 (1st Cir. 2006) (quoting Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 39 (1994)).  It was uncontested below and is uncontested now that the Department is an arm of the state and therefore entitled to

- 7 -

immunity and, accordingly, that the burden is on the McKennas to establish an exception to immunity. See Maysonet-Robles v. Cabrero, 323 F.3d 43, 49 (1st Cir. 2003) (placing onus to establish waiver of immunity or abrogation on party seeking application of that exception).

One such exception to Eleventh Amendment immunity is where Congress has abrogated immunity. Congress abrogates States' immunity when Congress (1) "unequivocally expresse[s] its intent to abrogate that immunity" and (2) "act[s] pursuant to a valid grant of constitutional authority." Buchanan v. Maine, 469 F.3d 158, 171 (1st Cir. 2006) (quoting Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 73 (2000)). We address each step of the Kimel test in turn.

## 1. **Kimel Step One: Unequivocal Expression of Intent to Abrogate**

Below, the McKennas argued that Congress abrogated the Department's sovereign immunity through Title II. The district court agreed at Kimel's first step that Congress had clearly expressed its intent to abrogate Eleventh Amendment immunity in Title II. See 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment . . . from an action in Federal or State court . . . for a violation of this chapter." (footnote omitted)).

## 2. **Kimel** Step Two: Valid Grant of Authority

In the context of Title II, to determine whether Congress has acted pursuant to a valid grant of constitutional authority, we look to the nature of the state conduct at issue. "[T]he Supreme Court has held that Title II of the ADA validly abrogates sovereign immunity as to (1) state conduct that actually violates the Constitution and (2) some classes of state conduct that do not facially violate the Constitution but are prohibited by Title II in order to 'prevent and deter unconstitutional conduct.'" Toledo v. Sánchez, 454 F.3d 24, 31 (1st Cir. 2006) (citation omitted) (first citing United States v. Georgia, 546 U.S. 151, 158-59 (2006), and then quoting Tennessee v. Lane, 541 U.S. 509, 518 (2004)). In Toledo, we summarized this test, as laid out by the Supreme Court in Georgia:

> [W]e must determine "on a claim-by-claim basis, (1) which aspects of the state's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid."

Id. (quoting Georgia, 546 U.S. at 159).

In addressing Kimel's second step -- whether Congress had acted pursuant to valid authority in seeking to abrogate immunity under Title II -- the district court applied Georgia.

- 9 -

First, the district court determined that the McKennas had stated a claim under Title II.[4]  See Buchanan, 469 F.3d at 172.  Next, the district court assessed the McKennas' argument that the Department's conduct violated the brothers' substantive due process and equal protection rights under the Fourteenth Amendment, concluding that the McKennas "ha[d] not demonstrated" a constitutional violation.  This analysis is at the core of the appeal, and we will provide additional details of the applicable principles and the district court's analysis in Section III.B.1.

Accordingly, the district court turned to the question of whether the state conduct, which did not amount to a constitutional violation, was prohibited by Title II in order to "prevent and deter unconstitutional conduct."  Id. (quoting Nev. Dep't of Hum. Res. v. Hibbs, 538 U.S. 721, 728 (2023)).  As the district court explained, that analysis is in turn dictated by the three-part inquiry that stems from the Supreme Court's opinion in City of Boerne v. Flores, 521 U.S. 507, 518 (1997), which describes

_____

[4] The district court explained that "[t]he [brothers] are people with disabilities under the ADA who share a logical and significant association as brothers living together in their family home"; that the Department "knew about their familial relationship and living arrangement"; and that, "though both [brothers] qualify for Shared Living Services at the Single Member Served level, [the Department] denied them those services because they live together.  As a result, they were reimbursed at half the rate they should have received."  Thus, the district court determined, "[t]hese allegations are sufficient to state a claim for associational discrimination."

when prophylactic legislation is permitted by Congress's enforcement power. To evaluate the constitutionality of prophylactic legislation, a court considers:

> (1) the constitutional right or rights that Congress sought to protect when it enacted the statute; (2) whether there was a history of constitutional violations to support Congress's determination that prophylactic legislation was necessary; and (3) whether the statute is a congruent and proportional response to the history and pattern of constitutional violations.

Toledo, 454 F.3d at 34-35. The district court determined that the McKennas "ha[d] not carried their burden" as to any of the three requirements of the City of Boerne inquiry. Thus, the district court concluded that "Congress did not validly abrogate state sovereign immunity" with respect to the McKennas' particular Title II claim and dismissed the suit.

## B. Analysis

With that basic framework and procedural history set forth, we turn to addressing the McKennas' arguments. First, we note that the Department does not contest that Title II satisfies Kimel's first step. And this court has previously explained that, in Title II, Congress "unequivocally express[ed] its intent to abrogate state sovereign immunity." Toledo, 454 F.3d at 31. Instead, the McKennas challenge the district court's analysis at Kimel's step two. Thus, the question before us is whether, in

- 11 -

expressing its intent to abrogate state sovereign immunity in Title II, Congress acted pursuant to a valid grant of authority.

The McKennas argue that the district court was wrong in concluding that their claims could not satisfy the test set forth in Georgia because the Department violated the brothers' constitutional rights. And, alternatively, they argue that Congress's abrogation was nonetheless valid under City of Boerne. As we will explain, we agree with the McKennas that the Department's decision violated the brothers' equal protection rights. Accordingly, Georgia's second prong is satisfied and Congress validly abrogated sovereign immunity in this context. Thus, we need not consider their argument under the City of Boerne test. And, because the parties do not dispute that the McKennas stated a claim of associational discrimination under Title II, see supra note 5, we need not consider the first prong of the Georgia inquiry. Thus, we begin our discussion at Georgia's second prong. Because we conclude that the alleged conduct violated the Fourteenth Amendment, that is also where our inquiry ends.

## 1. Georgia's Second Prong: Whether the Department's Conduct Violated the Fourteenth Amendment

The second prong of the Georgia inquiry asks "whether any of the [Department's] conduct that violated Title II independently states a violation of the Fourteenth Amendment." 454 F.3d at 32. If we conclude that the Department's conduct

- 12 -

violates the Fourteenth Amendment, Congress's abrogation of sovereign immunity is valid and the Department is not entitled to immunity. The McKennas invoke their equal protection rights,[5] arguing that the Department's conduct impinged on the brothers' fundamental rights and therefore must be reviewed with heightened or strict scrutiny, which the McKennas contend the Department's conduct cannot withstand.

### a. Level of Review

We begin, as the district court did, with the question of what level of scrutiny to apply. The district court rejected the argument that the Department's conduct impinged on the brothers' fundamental rights to associate and live with their family members because the brothers "have always lived together with their parents in their family home" and the McKennas "ha[d] not alleged any threat to this living arrangement."

Accordingly, the district court assessed the Department's action under the rational basis standard. The Department contended that its "actions were based on a legitimate governmental purpose -- to conserve limited financial resources by providing reimbursement to just one person for the usually-simultaneous provision of services to two [m]embers in the

---

[5] Below, the McKennas also asserted that the Department's conduct violated the brothers' substantive due process rights. The district court rejected this argument, and the McKennas do not challenge that conclusion on appeal.

same home." The court accepted the Department's cost-saving explanation and reasoned that "it [was] difficult to see how [this cost-saving measure] differs from any number of legislative funding choices" and that "the wisdom of [such] decision[s] is left to elected officials."

The McKennas now contend that the district court erred in applying rational basis review and that the district court should have instead applied a heightened level of scrutiny.[6] The McKennas raise two primary arguments as to why the Department's actions should be reviewed under heightened scrutiny: that their conduct burdened a suspect or quasi-suspect class -- namely, disabled individuals -- and that it impinged upon the brothers' fundamental right to associate and live with one another. See Toledo, 454 F.3d at 33 ("Unless state action burdens a suspect class or impinges upon a fundamental right, we review equal protection claims for a rational relationship between the disparity of treatment and a legitimate government purpose." (citing Heller v. Doe, 509 U.S. 312, 319 (1993))). The Department contends that neither argument is availing. However, we need not resolve the dispute over the applicable level of scrutiny because we agree with the McKennas that, in any event, the Department's

---

[6] It is unclear whether the McKennas seek the application of strict scrutiny or intermediate scrutiny. Given our conclusion, we need not resolve this ambiguity.

- 14 -

conduct cannot survive rational basis review.  See <u>Att'y Gen. of</u> <u>N.Y.</u> v. <u>Soto-Lopez</u>, 476 U.S. 898, 904 (1986) (noting there was "no occasion to inquire whether enhanced scrutiny was appropriate" where "contested classifications did not survive even rational basis scrutiny").

"The general rule is that [government conduct] is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."  <u>City of Cleburne</u> v. <u>Cleburne Living Ctr.</u>, 473 U.S. 432, 440 (1985); <u>see also</u> <u>Foote</u> v. <u>Ludlow Sch. Comm.</u>, 128 F.4th 336, 356 (1st Cir. 2025) (per curiam) ("[W]e presume the challenged conduct is valid so long as it 'is rationally related to a legitimate state interest.'" (quoting <u>González-Droz</u> v. <u>González-Colón</u>, 660 F.3d 1, 9 (1st Cir. 2011))).  As we have explained, "[t]he question is not what went on in the mind of the state actor but whether anyone, including the judge, can conceive of a rational reason for such a classification."  <u>Jeneski</u> v. <u>City</u> <u>of Worcester</u>, 476 F.3d 14, 17 (1st Cir. 2007) (citing <u>Nordlinger</u> v. <u>Hahn</u>, 505 U.S. 1, 11-12 (1992)).  And, under rational basis, plaintiffs bear the burden of demonstrating that "there exists no fairly conceivable set of facts that could ground a rational relationship between the challenged classification and the government's legitimate goals."  <u>Doherty</u> v. <u>Merck & Co.</u>, 892 F.3d

493, 500 (1st Cir. 2018) (quoting Eulitt ex rel. Eulitt v. Me. Dep't of Educ., 386 F.3d 344, 356 (1st Cir. 2004)).

### b. Application of Rational Basis Review

With these principles set forth, we turn to whether the Department's actions survive rational basis review. It is first necessary to define the Department's conduct that we are considering. Here, the brothers were both determined to require and to be eligible for around-the-clock one-on-one care by a DSP, like all members at the Single Services level. However, the Department, in interpreting the applicable regulatory scheme, determined that if two such members -- Gaven and Jared -- lived together, they were entitled to reimbursement for a single DSP to provide care for both members.

The Department contends that its decision was in furtherance of its legitimate governmental objective of cost-saving. And it is uncontested that saving money is a legitimate governmental purpose. Of course, as the McKennas acknowledge, providing fewer services will necessarily result in a cost-saving for the state. Instead, the parties' dispute relates to whether identifying cost-saving alone is enough.

The McKennas argue that "cost-saving alone does not provide a rational basis for discriminati[on] . . . . Rather, the cost-saving approach must be accompanied by a rational explanation for the decision to differentiate." The Department disagrees with

- 16 -

this position, arguing that cost-saving alone is enough to render its decision rational. We disagree with the Department's assessment of the law. As we explain below, the cost-saving must be connected to a rational government decision or policy.

Although the Department points to several cases that explain the legitimacy of cost-saving as a government objective, those cases ultimately undermine the Department's position as each highlights the importance of the connection between the government's goal of cost-saving and a rational decision or policy chosen to effectuate it. See Rodriguez ex rel. Rodriguez v. United States, 169 F.3d 1342, 1351 (11th Cir. 1999) (explaining that Congress cannot draw "wholly irrational" lines to effectuate the valid goal of cost-saving (quoting Mathews v. Diaz, 426 U.S. 67, 83 (1976))); Guttman v. Khalsa, 669 F.3d 1101, 1115-16, 1123 (10th Cir. 2012) (approving of line -- drawn partially to save costs -- that also allegedly furthered public-safety goals); Toledo, 454 F.3d at 34 ("All of these actions are rationally related to the University's academic mission and budgetary constraints . . . ."); Jefferson v. Hackney, 406 U.S. 535, 549 (1972) ("Since budgetary constraints do not allow the payment of the full standard of need for all welfare recipients, the State may have concluded that the aged and infirm are the least able of the categorical grant recipients to bear the hardships of an inadequate standard of living."); but cf. Council 31 of the Am.

- 17 -

Fed'n of State, Cnty. & Mun. Emps. v. Quinn, 680 F.3d 875, 887 (7th Cir. 2021) ("Instituting cost-savings measures is unquestionably a legitimate governmental interest, particularly for a government in such dire fiscal straits. And by Council 31's own admission the State would save approximately $75 million by implementing the pay freeze. It is therefore evident that the Rules are a rational method of contributing to the legitimate governmental aim of cost savings."). Rather than supporting the Department's position that cost-saving alone renders its actions constitutional, these cases underscore the requirement that there must be a rational connection between the Department's goal and its decision to treat the brothers differently based solely on the fact that they lived together. And the Department has presented no case where a court has determined that that a governmental act in furtherance of cost-saving is sufficient without a rational basis for the discrimination.

Accepting the Department's position would allow it to "protect [its coffers] through a random means, such as elimination from coverage of all persons with an odd number of letters in their surnames." Ohio Bureau of Emp. Servs. v. Hodory, 431 U.S. 471, 493 (1977). Rather, as the Supreme Court has explained, while "protecting the fiscal integrity of Government programs, and of the Government as a whole, 'is a legitimate concern of the State[,]' [t]his does not mean that [a legislature] can pursue the

- 18 -

objective of saving money by discriminating against individuals or groups." Lyng v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., 485 U.S. 360, 373 (1988) (citation omitted) (quoting Ohio Bureau of Emp. Servs., 431 U.S. at 493). Indeed, "cost alone does not support differentiating individuals." United States v. Vaello-Madero, 956 F.3d 12, 29 (1st Cir. 2020), rev'd on other grounds, 596 U.S. 159 (2022). By our estimation, the Department has sought to do exactly what the Supreme Court warned against in Lyng: to "sav[e] money by discriminating against individuals" without any rational justification to do so. 485 U.S. at 373. And, as we will explain, our own consideration of the Department's policy reveals no rational basis for the magnitude of the discrepant compensation.

Before the district court, the Department articulated its rationale as "conserv[ing] limited financial resources by providing reimbursement to just one person for the usually-simultaneous provision of services to two [m]embers in the same home." Before us, the Department briefly explained that it "reasonably believed that one person could provide the usually-simultaneous services (including meal planning and preparation) to two members in the same home, thereby conserving finite resources in order to distribute them to other [service recipients]." Thus, the Department based its decision to discriminate against the brothers on an assumption that some of

the care a DSP provides can serve two individuals at the same time. Even assuming this to be true, we cannot say that this would warrant requiring two individuals to receive half of the care they need.

Common sense dictates that care-taking for two entails more work than care-taking for one. While certain economies of scale might take hold when two members live together, at the very least, caring for two members generates more work, particularly where both are determined to need around-the-clock care. And the deference owed the Department's allocations of financial resources does not render its decision rational. See Lyng, 485 U.S. at 373 ("[O]ur review of distinctions that Congress draws in order to make allocations from a finite pool of resources must be deferential, for the discretion about how best to spend money to improve the general welfare is lodged in Congress rather than the courts." (citing Bowen v. Owens, 476 U.S. 340, 345 (1986))).

Rather than paying more in total -- whether 200% or some lower percentage keyed to the brothers' specific requirements -- the Department paid the same as if there were only one brother receiving services. The Department implemented a rule that if two members resided together, their services would be cut in half. If two members require around-the-clock one-on-one care, it is irrational to conclude that a single DSP can provide adequate care to both members. And, even assuming there are times where a

DSP can provide adequate care for two members at once, such tasks cannot comprise enough of each member's needs to assume that adding a second person would ever result in zero additional service requirements. Cf. Jefferson, 406 U.S. at 549 (finding decision to reduce benefits to younger constituents rational where "the State may have concluded that the aged and infirm are the least able of the categorical grant recipients to bear the hardships of an inadequate standard of living").

In searching for a rational basis behind the Department's determination that a single DSP can provide adequate care to two members in need of around-the-clock care and assistance with all daily activities, as we are obligated to do, we asked the Department to explain itself. Despite a state court opinion labeling the Department's decision "arbitrary," briefing from the McKennas explaining the lack of rationale, and direct questions at oral argument as to the basis for the determination, the Department has not once offered a valid rational explanation for its policy decision beyond "cost-saving." And our review of the Department's actions has unearthed no acceptable justification for what we can only describe as a "wholly irrational" line between the Department's decision and its goal of cost-saving. Rodriguez ex rel. Rodriguez, 169 F.3d at 1351 (quoting Mathews, 426 U.S. at 83).

Thus, because the Department has not offered any rational basis for its discrimination, the identified governmental purpose of cost-saving is not adequate. As the Department has not offered an alternative rationale for this decision, and we are not aware of any, we conclude that it fails rational basis review. Accordingly, we conclude that the Department's conduct, as alleged, violated the brothers' equal protection rights. Therefore, Congress acted pursuant to valid constitutional authority in abrogating sovereign immunity in this context and Georgia's second prong is satisfied.[7]

## IV. Conclusion

For these reasons, we **reverse** the district court's dismissal and **remand** for further proceedings consistent with this opinion.

---

[7] Given this conclusion, we need not consider Georgia's third prong and whether City of Boerne would support abrogation.